CASE 3—TAXATION—MARCH 13, 1884.

# City of Louisville v. Cochran.

APPEAL FROM LOUISVILLE CHANCERY COURT.

The Legislature has no power to interfere with the title of the citizen to his property either by express enactment or by the destruction of the remedies for its defense and protection.

The act of the General Assembly, entitled an "Act to Amend the Charter of the City of Louisville," *approved March* 29, 1882, prescribes the form of a petition to recover back taxes alleged to be due this city; that only certain defenses shall be allowed by the court; that all the affirmative allegations of the answer shall be held as controverted, "and the tax-bills shall be evidence of every fact necessary to entitle the city to recover."

Such an act, so far as it presents the form of the petition, restricts the defense and changes the rules of evidence, is unconstitutional and void.

H. M. LANE FOR APPELLANT.

The power provided for in the act of March 29, 1882, is a sovereign power, unfettered and unlimited, save and except that it must be exercised for a public purpose and upon rules of uniformity. Outside of these limitations the Legislature is unrestricted in the levy of a tax and in the provisions for its collection.

The subjoined authorities are sufficient to establish the principle that an act which provides the machinery for a just and fair assessment, for the levy of a tax, and provides that, if the property assessed is liable to taxation, the tax so assessed and levied shall be paid, or if not paid, enough of the property assessed to pay the tax shall be sold, is constitutional.

(Commonwealth v. Rhodes, 5 T. B. Mon., 642; Cooley on Constitutional Limitations, 163; Section 784, Iowa Revision, 1860; Allen v. Armstrong 16 Iowa, 508; Thompson v. Carr, 13 Bush, 218; Marshall v. Donovan, 10 Bush, 691; People v. Todd, 23 California, 184; Saving Bank v. United States, 19 Wal., 240; 12 Bush, 716; 2 Dutcher, 399; 4 T. B. Mon., 487; L. & N. R. R. Co. v. Commonwealth, 1 Bush, 261; N. C. R. C. Co. v. Alamance, 82 N. C., 259; Session Acts, 1875–76, vol. 1, page 494; Thompson v. Breckinridge, 14 S. & R., 348; Stewart v. Shonfelt, 13 S., & R., 360; Hubley v. Keyser, 2 Penn. R., 496; Strand v. Shoemaker, 1 W. & S., 166; Fayer v. Campbell, 5 Watts, 288; Frick v. Sterrett, 4 W. & S:, 269; ; Opin-

ion Justice Melin, in the case of Lord v. M. & M. R. R. Co., 17 Wisconsin, 570; Falls v. Mayor of Maysville, 19 California, 391; People v. Rains, 23 California, 131; Smith v. Cleveland, 17 Wisconsin, 556; Wakeldy v. Nicholas, 16 Wisconsin, 588; Commissioners v. Morrison, 22 Minn., 178; State v. C. P. R. R. Co., 10 Nevada, 61; Gynne v. Neiswanger, 18 Ohio, 400; Thatcher v. People, 79 Illinois, 597; Cooley on Taxation; Commonwealth v. Rhodes, 5 Mon., 642; Cooley on Constitutional Limitations, 16 Iowa, 508; 13 Bush, 218; 10 Ill., 691; 23 Cal., 184; 19 Wall., 240; 12 Bush, 716; 4 Mon., 487; 1 Bush, 261; 82 N. C., 259; Session Acts., 1875-6, vol. 1, 494; 14 S. & R., 348; 13 Ill., 360; 2 Penn. R., 496; 1 W. & S., 166; 5 Watts, 288; 17 Wis., 570; 19 Cal., 391; 23 Ill., 131; 17 Wis., 556; 16 Ill., 588; 22 Min., 178; 10 Nev., 61; 18 Ohio, 400; 79 Ills., 597.)

No brief for appellee.

CHIEF JUSTICE HARGIS DELIVERED THE OPINION OF THE COURT.

This was an action in the Louisville Chancery Court, to recover back taxes for the years 1876 and 1877, on the following petition:

"The plaintiff, the city of Louisville, says that the defendants hereto are the owners of a certain lot of land in the city of Louisville (description is here given), the taxes assessed and levied on, which lot of land by this plaintiff in and for the years 1876 and 1877 have not, nor have any of them, been paid to this plaintiff, and the bills for which are filed herewith and made a part hereof. Wherefore, the plaintiff prays judgment for the amount of said taxes, and its costs and the enforcement of the lien given by the statute, the sale of the said lot of land and for general relief."

The appellees severally demurred to the petition on the ground that it did not state facts sufficient to constitute a cause of action. The court sustained their demurrers, dismissed the petition, and the city took this appeal.

The petition is in exact conformity with the form of petition prescribed by section 6 of an act of the Legislature to amend the charter of the city of Louisville, approved March 29, 1882. The parts of that section essential to the decision of the grave questions raised by the assignments of error and argument, in this case, are as follows:

"The tax-bills, directed by the 5th section hereof to be made out by the Assessor of said city, shall be by him listed for collection by the Back-tax Collector of said city, who, if such bills be not *promptly paid*, shall cause actions to be instituted thereon in the Louisville Chancery Court to coerce the payment thereof, and cause such actions to be prosecuted to a final judgment, according to the rules and practice of said court, except that the petition in all such cases shall be as follows."

Here follows the form of petition adopted in this suit.

The section then provides: "No defense shall be allowed to any action instituted under the authority of this section, except that the lands, improvements, or personal property assessed for such taxes *were not liable to be assessed* on or as of the dates at which so assessed or re-assessed, or that the taxes sued for have been *paid* in *whole* or in *part*, * * * and in all and every action instituted by the ·city of Louisville to recover payment of taxes, *the affirmative allegations of the answer shall be treated and held as controverted.*"

By section 8, at its close, it is provided that "the tax-bills shall be *evidence of every fact necessary to entitle the said city to recover* * * * * * in any action for the recovery of taxes."

The tax-bills, directed by the 5th section to be made out by the Assessor, are to embrace taxes defectively levied and assessed for the years 1876, 1877, 1878, 1879, 1880, and 1881, and to be issued upon an assessment of omitted property and a re-assessment of property defectively assessed for each or either of the years named.

The supposed facts contained in the recital of the 5th section are said to have been the moving cause of this extraordinary enactment, and their recital, although not conclusive or presumptive evidence of their truth as to strangers to the act, furnish, in some degree, evidence of the good intent of the Legislature in passing it. That recital is as follows :

"Whereas, defects existed in the assessment and levy of taxes by said city in each of the years 1876, 1877, 1878, 1879, 1880, and 1881 ; and whereas a large proportion of the persons owning lands or improvements on which taxes were levied in each of said years have paid such taxes in full; and whereas, others owning lands or improvements in said city, and on which taxes were levied by said city in each of said years, have failed to pay such taxes, or have paid them for only some of said years ; and whereas, there were lands or improvements in said city liable to be, but which were omitted to be in said years, or in some of them, assessed for taxation by said city ; and *whereas, it was at all times doubtful whether the payment of such unpaid taxes could have been legally coerced*, or *such omitted property legally assessed :* now that the principle of an equal and just taxation may be preserved, it is made the duty of the Assessor" to assess and re-assess the property and improvements omitted, or on

which taxes have not been paid, for any or all of the years named.

These extracts from the act show that the property and improvements sought by it to be subjected to taxes were, from some illegality in the levy or assessment for those years, either beyond the lawful power of ministerial officers or protected by the law of the land, as administered by courts of justice from coercive sale, either under judicial decree or by ministerial officials. What that illegality is, or was, can not be obtained by an inspection of the act, but whatever it may be, there are rules, based upon constitutional protection to property, which define the curative power of the Legislature and fix limits to retrospective laws. The line limiting legislative power on this subject falls between what are termed mere irregularities in legal proceedings, arising from defects in them, which may be cured by legislative enactment, unless expressly forbidden, and those defects which relate to the substance of right or jurisdiction, and which can not be cured without cutting off defenses, based upon irrevocable facts, out of which the right grows, or divesting vested rights in property, or destroying the remedy for its protection, which gives value to it, or enacting unequal and partial legislation, or adopting some of the other innumerable modes of invading the rights of life, liberty, and property, which the Legislature might resort to, or mistakenly assume, were it permitted to pass the bounds of its constitutional power to legislate and usurp judicial functions committed to another and a co-ordinate department of the government. (Sec. 2, Art. 1, Cons. Ky.)

The general rule, says Cooley on Constitutional Limitations, 371, speaking of statutes to cure irregularities. in the assessment of property for taxation, and the levy of taxes thereon, is:

"If the thing wanting, or which failed to be done,. and which constitutes the defect in the proceedings, is. something the necessity for which the Legislature might have dispensed with by prior statute, then it is. not beyond the power of the Legislature to dispense with it by subsequent statute. And if the irregularity consists in doing some act, or in the mode or manner of doing some act which the Legislature might have made immaterial by prior law, it is equally competent to make the same immaterial by a subsequent law."

This general view of the question, whose converse is. equally true, shows the doctrine more concretely stated above to be sound law ; but what matters are essential, or non-essential, to binding legislative proceedings, depend upon rights which existed before we had a constitution, and rights which have been created by the constitution, through its expressions, inhibitions, and limitations.

We shall look into these great matters.

The 29th chapter of Magna Charta granted that "No freeman shall be taken or imprisoned, or disseised of his freehold or liberties, or free customs, or be outlawed or exiled, or any otherwise destroyed, nor will we pass upon him, nor condemn him, but by *lawful* *judgment of his peers, or by the law of the land.* We will sell to no man ; we will not deny or defer to any man either justice or right." This is fundamental law in a monarchy where even class distinctions exist, and

·certainly it is fundamental in a government of equal rights, equal law, and equal remedies, its spirit and ·essence are embodied in the Fifth and Fourteenth Amendments to the Constitution of the United States, by which it is declared that no person shall be deprived ·of life, liberty, or property, "without due process of law," and embraced in the constitution of every State in the Union, and in that of Kentucky, in these words : "Nor can he be deprived of his life, liberty, or prop-·erty, unless by the judgment of his peers or the law of :the land."

It is important that we understand here what is the ·meaning of "due process of law," or "the law of the land."

This court said, in Varden v. Mount, Hines, Judge, ·78th Kentucky, 89 :

"The meaning of that provision has generally been ·construed to be a law that hears before condemning, .and arrives at a judgment for the divestiture of the rights of property through what is ordinarily under-.stood to be judicial process — the general rules that govern society in reference to the rights of property."

In the case of Taylor v. Porter, 4 Hill, the court, commenting on them, say : "Their meaning * * .seems to be that no member of the State shall be dis-franchised or deprived of any of his rights or privi-leges, unless the matter shall be adjudged against him upon trial, had according to *the course of common .law*," and not by mere legislation.

And again : "The words, 'due process of law,' in this place, can not mean less than a prosecution, or :suit, instituted and conducted according to the pre-

scribed *forms* and *solemnities* for ascertaining guilt, or determining the title to property."

In Westervelt v. Gregg, 12 N. Y., 209, it was said: "Due process of law undoubtedly means in the due course of legal proceedings, according to those *rules* and *forms* which have been established for the *protection* of private rights." That definition of the phrases in question which seems to meet Judge Cooley's approval, is taken from an opinion in the case of The Bank of Columbia v. Okely, p. 244, 4 Wheaton, where it is said "that they were intended to secure the individual from the arbitrary exercise of the powers of government, unrestrained by *established principles of private rights and distributive justice.*" These quotations furnish a correct general notion of the meaning of "the law of the land."

It is well and clearly settled that "the law of the land," in constitutional meaning, refers to the common and statute law in force when the constitution was adopted. The great question then is, not what the common and statute law were at the adoption of our constitution, for these may be easily ascertained, but how far can the Legislature proceed in changing either and not transgress the law of its own power, as limited and curtailed by the constitution of the State.

It is now generally understood by citizens, as well as courts, that the Legislature has no power to interfere with title of the citizen to his property, or to interrupt him in its free enjoyment, much less to transfer it, against his will, to another, either by express enactment or destruction of the remedies for its defense and protection. This general rule is subject to exceptions:

City of Louisville v. Cochran.

that relate to the power to exercise the right of eminent domain, which is the right to take private property for public use upon due compensation being made; to authorize the levy assessment and collection of taxes for public purposes; to give direction to title of property subjected for such purposes; to provide for the necessities of the State and the like, but the exercise of legislative power, even over these subjects, has its bounds, and must be uniform and cast an equal burden upon the citizen, and free from favoritism, special privileges and discrimination, and according to the law of the land.

There is, it is true, a vast difference as to controversies between citizen and citizen, relative to their private rights, and controversies between government and its citizens about their public duties. As to the former, the law of the land throws its inviolable protection around the property of the citizen through constitutional preservation of due process of law, which means that he shall be brought into court by notice or warning, and there given an opportunity to make known or assert his rights, or maintain his lawful defenses, introduce his evidence, have it heard and weighed according to its truth, unrestricted by arbitrary rules that pervert its meaning, and have judgment pronounced upon his cause after a regular, fair, open trial, according to the principles of private right and distributive justice, as administered by the usage course and solemnities of the common law. To the latter a different rule, based upon State necessity and immemorial usage, is applicable. The laws for the levy, assessment, and collection of taxes may be summary in their nature, and dispense

with the careful and methodical steps of the common law in giving personal notice, making up issues by regular pleadings, having a trial by jury, judgment, and execution. (2 Overton, 215.) The collection of taxes under such summary laws is generally and properly confided to ministerial officers. And when the power of levy and assessment are delegated, notice is usually required as to the former, and must be given, and an opportunity to be heard allowed as to the latter. And while this summary remedy for levying, assessing, and collecting taxes has the plea of necessity and immemorial usage for its support, every dictate of natural justice and the letter and spirit of the constitution require that the citizen shall be warned, and have an opportunity to be heard before he is condemned, or his money or property taken, and secure to him the right to have a judicial hearing upon the existence of an alleged power and the legality of its exercise whenever his constitutional rights are imperiled thereby. These permissible summary laws for execution of the taxing power pre-supposes, whether the levy be directly made by the Legislature, or the power be delegated to other authority, that the purpose of the levy is public, and the taxes to be raised by it are in some reasonable or ascertainable degree a benefit to the public, and that the assessment is uniform, equal, free from fraud, and in the name of the owner or possessor of the property. (42 Mo., 167.) Then with these antecedent requisites existing, the ministerial officers may proceed, but they must comply strictly with the statute under which they act. And the citizen is entitled to notice and an opportunity to contest the valuation of his property, and the

Legislature has no powers to deny to him this right; but whether the proceedings in execution of the taxing power be summary and confided to boards, assessors, and ministerial officers, or judicial and invested with the forms and solemnities that signalize a court, they must be, according to the "law of the land," whose prime essentials are alike applicable to all proceedings by which a citizen may be deprived of life, liberty, or property. To ascertain what will satisfy "the law of the land," with reference to such summary proceedings, is a matter of great difficulty, growing out of the grounds on which the rule that supports them is based, and the plausibility, if not reasonableness, of the position that they are in conflict with the letter and spirit of the constitution.

Mr. Cooley, in reference to such laws and the exercise under them of the taxing power, says: "Due process of law in each particular case means such an exertion of the powers of government as the settled maxims of the law permit and sanction, and under such safeguards for the protection of individual rights, as those maxims prescribe for the class of cases to which the one in question belongs." (Con. Lim., 357.)

The court, in State v. Allen, 2 McCord, with reference to the process for collecting taxes, said: "We think that any legal process which was originally founded in necessity, has been consecrated by time and approved and acquiesced in by universal consent, is embraced in the alternative law of the land."

And this court said, in Harris v. Wood, 6 T. B. Mon., 643: "Taxes were always recoverable, not only without a jury, but even without a judge, and the assess-

ment of ministerial officers has been made to operate as an execution on the citizen, and the collector could distrain, and any public collector could be subjected to judgment on motion for the amount."

These authorities, and many others not necessary to cite, may be considered as settling the question that summary process, usually adopted in this and other States for the enforcement of the taxing power, is not contrary to the law of the land, as secured to the citizen by the constitution. But in every case, and under all forms of remedy, the citizen has a right, which must be preserved, to be heard before some tribunal on all questions which are essential to the constitutional protection of his property. The power to levy and collect taxes is an incident of sovereignty, and it belongs to the legislative department, but the *exercise* of that all-pervading power, like every other governmental power, is so limited that it cannot be arbitrary, and is subject to rules prescribing bounds to the purpose of the levy, and regulating the manner of assessment and collection. The purpose must be public, which is usually ascertained by the benefits to flow from the collection of the tax to the public and the consideratian which supports the exaction from the citizen. The "form of taxation" and the power to enforce it can not be assumed to cover a different purpose which is beyond legislative authority; nor can a levy be so made, or statutes for enforcing it so framed, as to prevent an inquiry, by the courts, into the nature of the levy or the character and purpose of the alleged tax, when such inquiry might show that either levy or tax was the result of an unconstitutional assumption or forbidden ex-

ercise of legislative power. This follows from the fact that the Legislature is not possessed of uncontrollable power to declare any levy it may make or authorize to be a tax, when, in fact, it is not a tax, but a guise to mistaken or purposed assumption of legislative power, and when the levy is unassailable, still the statute prescribing the manner for the assessment and collection of the tax is invalid, if it precludes the citizen from a hearing on such questions as that of inequality, of burden, fraud in the assessment, collusion by assessors or collectors with tax-title purchasers, or upon a state of facts which existed at the passage of a curative act that forbade the interference with them by the Legislature, on constitutional grounds or principles, on which the inherent and highest rights of men are based, and have been immemorially recognized in this government. Such statute would be unconstitutional, because it would then destroy the rights of the citizen through the indirect methods of an alleged remedy which the Legislature had no power to formulate.

For the direct destruction of individual rights by legislative declaration is no less unconstitutional than the enactment of remedies which lead to similar results. (Vanzant v. Waddell, 2 Gerger, 270.)

And the *manner* of the exercise of an otherwise just and clear authority may be as usurpatory as an arbitrary assumption, and it is the most insiduous method of unauthorized acquisition of power, whose slightest touch should be the instant for pause, and its first and every assertion the occasion for fearless resistance, and the ground of respectful, but determined disregard.

Looking to these general views, we will inquire

whether the provisions of the act under consideration are permitted or sanctioned by any maxim of law or legal process known to "the law of the land" for the levy and collection of taxes.

It prescribes what facts shall constitute a cause of action for taxes by declaring a form of petition, which is almost without substance and clearly insufficient to show any legal right to collect the taxes, if essential elements which constitute that right are to be considered.

It so circumscribes the defense to this legislative petition as no inquiry can be made under the permitted issues that might show fraud, oppression, or inequality in the assessment, illegal purpose of the levy, spoliation, vested rights, completed limitation, partiality of the act itself, or any other valid defense which would be a bar to a recovery of this tax, whose history it closes, by an alteration of the rules of evidence that violates the laws of cause and effect, sets at naught the deductions of common sense, and has no place in the list of conclusive legal presumptions, which are based on the common experience of mankind affected by kindred conditions.

Section 6, in prescribing the form of petition, confines it to the following elements—

1. That the defendant owns the real estate, and it is situated in the city.

2. "The taxes assessed and levied on which" have not been paid, and the tax-bills for which are herewith filed.

3. The prayer.

The first element contains an affirmation, and, as to the second, the affirmative matter, is *non*-payment.

There is no direct *allegation* that the taxes were assessed or levied by any authority, and for aught that appears in the petition, they may never have been levied or assessed, and, if so, the levy and assessment may have been void for some of the reasons indicated in this opinion. As to the "tax-bills," they may be false, or fraudulent, or issued without warrant of law. How far the Legislature may go in providing general modes of pleading, we need not now determine, for this petition is made potent for evil, and contrary to "the law of the land," by limitating the grounds of defense and altering the effect of evidence, to which is affixed an arbitrary meaning and force. \

The defense is confined to two grounds—

1. That the property was not taxable, conceding the validity of the tax.

2. The defendant had paid the amount.

And in order, it must be supposed, to relieve the city from proof, as well as averment, the affirmative allegations of the constricted answer are commanded to "be treated and held as controverted"—a favor denied to the general body of litigants; and section 8, on the evidential branch of anticipated inquiry, declares that " the *tax-bills shall be evidence of every fact necessary to entitle the city to recover in any * * * action for the recovery of taxes.*"

Thus the illegal machinery of this act was complete for stifling inquiry into substantial and constitutional rights which may exist, and which no lawful power is able to destroy, by exempting the city from making allegations of facts essential to recovery, denying the privilege to the defendant of raising any issue as to

those essentials, and dispensing with their proof by investing facts with a factitious force.

One more reference to the extraordinary features of the act, and we will pass to our concluding views.

By section 2 it is declared that attested copies of *letters*, required by the charter to be written and recorded, taken from the record, shall be evidence that such letters were "mailed in the post-office in said city, postage prepaid."

It is contended by counsel that the Legislature meant to make, and had the right to make, the tax-bills and attested copies of letters *conclusive* evidence of the facts as indicated in the act. And this, we think, is what the act really means, for the reason that the tax-bills and letters were competent, but not conclusive evidence, without aid from the act on any question which might affect either, or bear upon the duties connected with them. But the Legislature has no more power to give conclusive effect on a vital point to such evidence than it has to declare truth to be falsehood, or a fact to be present where none exists.

In the case of Abbott v. Ludenbower, 42 Mo., 166, the court said: "There is abundant authority, (and this we find, on examination, to be true), to the effect that the Legislature may make the deed of a public officer *prima facie* evidence of title, but they can not make it *conclusive evidence* as to matters which are vitally essential to any valid exercise whatever of the taxing power."

And in Allen v. Armstrong, 16 Iowa, 508, the court laid down the rule in this language: "We state the principle which must be legally and logically true in

City of Louisville v. Cochran.

this wise :   If any given step or matter in the exercise
of the power to tax (as, for example, the fact of a levy
by the proper authorities) is so indispensable that with-
out its performance no tax can be raised, then that step,
or matter, whatever it may be, can not be dispensed
with, and, with respect to that, *the owner cannot be ex-
cluded from showing the truth by a mere legislative
declaration to that effect.*"

These authorities, and the reason of the rule itself,
are sufficient to refute the claim that the Legislature
has power to give such evidence conclusive effect as to
"*every fact necessary to entitle the said city to recover,*"
or of any fact essential to be communicated to the citi-
zen, as notice to enable him to have a hearing about the
valuation of his property, or the like, unless such com-
munication is sufficiently proven, like other facts, to
have been made.

What might be the result, were this evidence allowed,
the sweeping conclusive force attempted to be imparted
to it by the act ?   The hearing directed by the 5th sec-
tion, to be given the citizen on valuation only of his
property, could be proven, though never given.   While
the law requires the board to be in continuous session,
it might not do its duty, and this be the ground of the
citizen's complaint, yet a letter informing him of the
fact that the board had given him an opportunity of a
hearing by being in continuous session, though never
mailed or heard of by him, would close that matter.
And so the production of a "tax-bill" would settle
every *necessary* fact, regardless of its truth, whether
evidence of a mere curable informality or the non-exist-
ence of the essentials which vitalize the taxing power,

or of facts that prevent unequal burdens, fraudulent
assessments, or which might show that the provisions
of this act were, in their operation, contrary to "the
law of the land." The act excludes investigation into
those defects which are incurable, as well as those
that are merely formal, and were it sanctified into a re-
spected precedent, it would enable the law-making
power to declare its own acts constitutional by de-
priving the citizen, through the process of regulating
remedies, of all means of testing their validity, or
questioning legislative power, or the manner of its
exercise.

Under this act the levy may be void, the assessment
unequal, vested rights divested, the property of one
man listed in the name of another, the real owner de-
prived of notice, and an opportunity to reduce an op-
pressive valuation, and so on, yet the doomed defend-
ant must submit without the benefit of the law of the
land, because the city need not allege and he is not per-
mitted to plead any facts which would raise such ques-
tions, and were they to find their way into this new
mode of forensic trial, the production of the "tax-bill"
would conclusively settle them in favor of the plaintiff.

While it is true that a legislative act, plainly within
the limits of legislative power, is itself the law of the
land, and the Legislature is invested with power to
levy or prescribe the mode of levy, and provide the
means of enforcing the collection of taxes, yet where
summary, or, as it is sometimes called, administrative
process is provided, and its execution confided to min-
isterial officers, the courts may, nevertheless, hear and
determine such questions as involve the existence

of the power over the particular subject, or its unauthorized exercise in the manner of the levy, or by the means and method adopted for the assesment and collection of the tax. These are subjects over which the courts can not be deprived of jurisdiction by the Legislature, for the reason that they are judicial subjects, confided to the courts by the constitution, and the right to whose investigation, through their instrumentality, is secured to the citizen by the "law of the land."

Thus, while summary process, based upon necessity and immemorial usage, is allowed, and its execution generally and properly confided to ministerial officers, the rights of the citizen are guarded by "the law of the land" from invasion, in the name of this very summary process itself, and by the unregulated assertion and the unconstitutional assumption of power; courts, because their powers are judicial, can not be burdened with the duties incident to collection of taxes in the ordinary course, nor can they be compelled to perform the common duties of executive and ministerial officers, but they may be empowered to hear any judicial question arising between government and citizen, and when such power is conferred by act of the Legislature, the remedy for its exercise must be such as will enable the court to hear the facts, ascertain their truth, and render judgment according to right and the essential elements which constitute it. There is no power to compel the courts to decide that a petition contains a cause of action when it does not, where the act uttering such mandate forbids just and substantial defenses in advance, and alters the natural and logical effect of evi-

·dence, for the purpose of curing ambiguous defects and rendering past transactions and fixed facts actionable, ·when in truth, were they pointed out, they might show that they were beyond retroactive legislative power, :and *non*-actionable. If this were not so, "the law of the land" does not mean what has been shown, and the ·courts would be crowded with tax collections, under judicial guise, where non-essentials, and dispensed and dispensable conditions were disposed of by the legislative act, and nothing remained save these two questions: Was the property taxable? Has the owner paid the tax? And neither of them would be controverted in one case out of a hundred. This act can. not strip the courts of their orderly methods, close inquiry into those essentials which the judicial power was created to examine and maintain, and then exact judgment from them that carries with it the dignity of fair, open, full, solemn investigation, after the customs of courts and the forms of the common law.

It is conceded that the Legislature can, in its wisdom, alter, change, amend, or repeal both statute and common law, which prevailed at the formation of our constitution, so long as the principles of "the law of the land" embodied in them, and which are essential to the protection and maintenance of private rights and the redress and prevention of private wrongs, are substantially preserved.

"Administrative and remedial process may change from time to time, but only with due regard to the landmarks established for the protection of the citizen." (Cooley Con. Lim., 356.)

Hence the Legislature cannot, under its power to

regulate remedies and prescribe forms of pleading, dispense with allegation of essential facts, cut off substantial defenses, and order rules of evidence, or invade in any other manner the established principles of private rights, and of that common justice which divides, assigns, and deals out to each citizen his proper and equal portion thereof. And if the legislative power were not thus limited, the means or remedies recognized by "the law of the land," as essential in ascertaining right and rebuking wrong, would become the chief point of attack, or the post of danger, from unconstitutional assertion of such power.

In these means and remedies are to be found the security for the most sacred rights and best privileges of the citizen, for, if the forms and solemnities necessary to the orderly and intelligent determination of legal and equitable rights, according to the true meaning of "the law of the land," were stricken down in favor of one citizen against another, then while retaining the form of that clause of our constitution, which was translated from Magna Carta as the gem of civil rights, and still possessing the body of those laws, their virtue would be dead and useless for the remedy, their breath of life, that enables the citizen to enjoy the benefit of their principles, would be gone. If such results as this act seeks to accomplish could be reached by the methods it prescribes, "it would tend directly to establish the union of all powers in the Legislature. There would be no general permanent law for courts to administer or men to live under. The administration of justice would be an empty form and idle ceremony. Judges would sit to execute legislative judgments and

decrees, not to declare the law or administer the justice of the country. ' (Webster, in Dartmouth College case, vol. 5, p. 487, Works of Webster.)

The authorities and statutes enacted by sister States, which have been cited and urgently pressed by counsel for the city, go no further than to dispense with *form*, both as to action and defense, and they do not arbitrarily deny, in any manner or degree, the right to show any of the defenses which we have indicated are inviolable, nor are any of those statutes blemished with anticipative precautions that wholly destroy opportunity to assert or prove such defenses. Herein they differ from the present act, which is unconstitutional, so far as it prescribes the form of petition, restricts the defense, and alters the rules of evidence.

Wherefore the judgment is affirmed.