## Board of Levee Commissioners v. Johnson, et al.

(Decided December 11, 1917.)

### Appeal from Fulton Circuit Court.

1. Taxation—Local Taxing Districts—Legislature has Power to Create.—The legislature has power to provide for local public improvements in a designated district and to impose a tax therefor.

2. Taxation—Power of Legislature to Create Levee District and Provide a Tax Therefor.—The legislature has authority to create a levee district and provide for a tax on the property benefited by the levee to construct and maintain it.

3. Constitutional Law—Due Process of Law—The Law of the Land.—The two phrases, "Due process of law" and "the law of the land," one of which is found in every constitution, mean the same thing, and it is not important which phraseology is employed.

4. Constitutional Law—Due Process of Law—The Law of the Land—Definition of.—The phrases "due process of law" and "the

law of the land," when applied to actions, proceedings or prosecutions pending in court, mean that no citizen shall be deprived of his life, liberty or property without reasonable notice and reasonable opportunity to be heard according to the regular and established rules of practice and procedure before judgment is pronounced depriving him of either; and it matters not whether the sum in controversy be large or small, or the offense trifling or serious.

5. Constitutional Law—Due Process of Law—The Law of the Land—Application to Proceedings Not Pending in Court.—The principles that find expression in "due process of law" and "the law of the land," are not confined to court proceedings, or to cases or prosecutions pending in a court, but are broad enough to and do include efforts to take the property of a citizen when the attempt is made to do so under a power lodged by legislative authority in a city council or a board vested with authority to assess, levy and collect taxes or take property for public purposes.

6. Constitutional Law—Due Process of Law—The Law of the Land—Difference in Application of These Phrases When Applied to Court Proceedings and to Matters Affecting Taxes.—There is a distinction in the meaning and effect of the terms "due process of law" and "the law of the land" when applied to court proceedings and when applied to matters affecting the assessment and collection of taxes, and what would violate their meaning in a court proceeding would not violate their meaning in an ordinary tax proceeding.

7. Constitutional Law—Taxation—Due Process of Law in Tax Proceedings—Notice and Opportunity to be Heard.—When the power to assess, or to fix the value of the property to be subjected to a tax, or the amount of the tax, is lodged in some board created by the legislature, the property of the taxpayer cannot be taken for the tax unless at some stage of the proceedings, or in some form or manner, he has opportunity to be heard.

8. Constitutional Law—Taxation—Due Process of Law in Tax Proceedings—Notice and Opportunity to be Heard.—The right of the taxpayer to notice and opportunity to be heard in tax proceedings is just as indispensable, before his property can be taken for taxes, as it is before his property can be taken to satisfy a judgment, but in tax proceedings the notice and opportunity to be heard need not follow any established practice or procedure, but may be varied according to the will of the legislature.

9. Constitutional Law—Taxation—Character of Notice Necessary in Tax Proceedings.—In cases of special assessments for local improvements when the legislature leaves the laying off of the territory and the amount of the tax to a board, provision must be made for reasonable notice to the taxpayer who will be affected, either by publication or personal notice.

10. Constitutional Law—Taxation—Finality of Action by Board—Review by Court.—The action of the assessing board may be final, subject, however, to review by the courts when it is made to appear that the board acted corruptly or fraudulently, or made an assessment so excessive as to amount to spoliation.

11. Estoppel—When Property Owner May be Estopped to Question the Validity of Unconstitutional Tax Legislation.—Persons who procure the enactment of unconstitutional legislation will be estopped to challenge its validity after they have accepted benefits under it.

12. Estoppel—Unconstitutional Tax Legislation—What Will Amount to.—To work an estoppel that will deny the right to assail unconstitutional legislation, it must appear that the parties sought to be estopped aided in procuring the legislation and derived benefit therefrom, and that to set it aside would work a hardship and injustice on others.

13. Estoppel—Acquiescence in Local Tax Will Not Estop Property Owner from Challenging Validity of Additional Tax.—The fact that a property owner has paid a local and beneficial ad valorem tax for many years will not estop him from contesting the validity of an additional tax in the form of an acreage tax.

B. T. DAVIS and W. J. WEBB for appellants.

ROBBINS & ROBBINS and J. E. ROBBINS for appellees.

OPINION OF THE COURT BY JUDGE CARROLL—Affirming.

This action was instituted by W. C. Johnson and others as plaintiffs against the Board of Levee Commissioners of Fulton county and the sheriff of that county seeking to enjoin them from collecting a tax of twenty-five cents per acre levied by the Board of Levee Commissioners upon the lands of Johnson and others for the purpose of maintaining a levee along the Mississippi river in Fulton county.

After the pleadings had been made up and the case prepared for trial, it was submitted for hearing, and there was a judgment granting the relief prayed for, and the levee commissioners appeal.

It will here be convenient to set out so much of the statutory law of the State relating to levees as may be necessary to an understanding of the legal questions presented by the record. In 1902 the first law on this subject was enacted, and it is now contained in section 938a of the Kentucky Statutes. This act provided that the county judge of any county should have the power, when the exercise of it would be of public benefit, to establish and aid in the construction of levees along any

river in his county; that before he should establish any levee, there should be filed a petition setting forth the necessity therefor with a general description of the route of the proposed levee, giving the names of the owners of the land on which it was proposed to construct it; that the county judge should appoint three housekeepers as commissioners to assess damages in favor of the owners over whose land the levee ran. Other sections of the act regulated the proceedings to be taken after the report of the commissioners was filed. The act further provided for the appointment of five land owners as levee commissioners whose duty it should be to superintend the construction, care and protection of the levee when built.

It will be observed that this act did not describe the territory that would be benefited by the levee or provide for the laying off of any territory or district that would be benefited by it, or levy or authorize the levy or collection of a tax of any kind on any property to aid in building the levee or keeping it in repair. It simply authorized the construction of levees and the condemnation of land, if necessary, for that purpose. But in 1908 this act was amended by adding two sections that have been put in the statute as subsections 12 and 13 of section 938a. Subsection 12 has no connection with the matter before us, but subsection 13 gave the levee commissioners power, for the purpose of building or repairing levees, "to levy and have collected an annual tax on all property situated within the territory protected by said levee, of not exceeding 50 cents on the one hundred dollars, said property to be assessed, and the tax collected by the county assessor and sheriff, in the same manner and time and subject to the same requirements, as in the assessing and collecting of the county revenues; same, when collected, to be paid over by the sheriff to the levee commissioners, which, together with the proceeds of all fines assessed and collected under the provisions of this act, shall be used by said commissioners in the building or repairing of their levees."

No other change was made in the law until 1914 when the legislature passed an act that is now section 2438a of the Kentucky Statutes. The first thirteen sections of this act are merely a re-enactment of the eleven sections contained in the act of 1902 and the two sections contained in the act of 1908. The other sections of this act, except sections 18, 20 and 23a, provide for the

organization of the Board of Levee Commissioners, describe its power, and provide for the appointment by it of certain officers.

In section 18 it is provided: "That in cases where levee districts have been heretofore established, under the laws in force in the State of Kentucky, or hereafter established under this act, a lien shall exist for the cost of the establishment, construction, reconstruction, repair, enlargement, extension and maintenance of such levee against the land situated within the territory protected by such levee. . . . . The Board of Levee Commissioners in addition to the collection of the *ad valorem* tax provided for in section 13 of this act, shall for such purpose, have the power and it is authorized and empowered to make an assessment against such land of not exceeding fifty cents per acre per annum, which assessment shall be collected by the sheriff or tax collector of the county. . . . . It shall be the duty of the secretary of the said Board of Levee Commissioners, when the tax lists are furnished to said sheriff and tax collector, for the collection of the *ad valorem* tax, to also deliver to him a list of all persons owning land in such levee district protected by such levee together with the number of acres owned by each and description thereof and amount of assessment against each."

In section 20 it was further provided that it should be the duty of the levee commissioners "to annually make an assessment against the lands embraced in said levee district and protected by such levee, of not exceeding 50 cents per acre per annum; . . . . provided, however, that the assessment provided for in section 18 and under this section shall not exceed in the aggregate 50 cents per acre per annum."

Section 23a merely provided that "nothing in this act shall apply to counties having a population of 200,000 or more."

It will be observed that under the amendatory act of 1908 the Board of Levee Commissioners were authorized to annually levy an *ad valorem* tax of not exceeding 50 cents on each one hundred dollars' worth of property situated within the territory protected by the levee, and this section was re-enacted in 1914. It may also here be said that Johnson and the other property owners who are plaintiffs in this case are not complaining about the levy and collection of this 50 cents *ad valorem* tax authorized by the act of 1908, as well as by the act of

1914. They are only resisting the collection of the tax of 25 cents on each acre, authorized to be collected by section 20 of the act of 1914, and which was levied by the commissioners.

Turning now to the facts for a brief history of the levee legislation and what has been accomplished under it we find that in Fulton county, Kentucky, there was, prior to 1902, and is now, a large body of land containing probably thirty thousand acres, lying in what may be called Mississippi River bottoms. This land was subject to overflow by the Mississippi River, and as a result of these overflows the land, although extremely fertile, was practically useless for agricultural purposes and consequently of trifling value. In 1902 the owners of this land, conceived the idea of erecting a levee along the banks of the Mississippi River to confine its waters and prevent them from overflowing these lands when the river was high, and as a step in this direction they procured the passage of the act of 1902 heretofore mentioned. This act, as we have seen, did not describe any levee district or the lands that would be benefited or protected by the construction of a levee, nor did it authorize the county court, or any other authority, to define, or describe, or lay off a levee district or land that would be benefited by the erection of a levee. The promoters of the scheme seemed to assume that those affected by the legislation knew what land would be benefited and protected if the levee was built, that is to say, all the land lying between the Mississippi River and the hills some distance back of it; and so the act simply declared that the county judge should have the power to establish and aid in the construction of levees "where same shall be conducive to the public health, convenience or welfare, or when same will be of public benefit or utility."

It will further be observed that this act of 1902, although it provided for the appointment of a Board of Levee Commissioners and the taking of such land as might be necessary to construct levees, upon the payment to the owners by the persons who petitioned for the construction of the levee of the sum awarded to them as compensation for their land that might be taken, did not provide for or authorize the imposition of an *ad valorem* or other tax, or the exaction of any sum from the persons whose lands might be benefited by the levee. It appears, however, that by voluntary contributions, to-

gether with assistance obtained from the United States government, a substantial levee was built a distance of some fifteen miles in Fulton county and to the Tennessee line, where it connected with a like levee constructed by Tennessee property owners.

After the construction of this levee it was maintained by voluntary contributions aided by assistance from the federal government, until 1908 when the legislation heretofore referred to was enacted authorizing the levee commissioners to levy and collect a tax of not exceeding 50 cents on the one hundred dollars "on all property situated within the territory protected by said levee, the tax to be used by the commissioners in the building or repairing of levees." This act of 1908, as will be seen, did not lay off or describe any levee district or territory protected by the levee, nor did it make any provision for giving the persons whose property was taxed a hearing on the amount of tax that should be levied, or the property that should be subjected to it. It simply gave the levee commissioners the power to lay the tax "upon all property within the territory protected by the levee."

It further appears that under this Act of 1908, a 50-cent *ad valorem* tax was levied and collected each year and is yet being levied and collected without objection on the part of the property owners who are required to pay it, among them being the plaintiffs who brought this suit. It may, therefore, be assumed, that these plaintiffs consented not only to the imposition of this tax by the levee commissioners, but to the laying off of the territory to be benefited by the levee, and consequently may be required to pay this tax so long as it is needed to maintain it in repair. It is further shown that by the erection of the levee this naturally valuable Mississippi River bottom land, that had remained unproductive on account of overflows of the river, was reclaimed for agricultural purposes and much of it is now highly productive and exceedingly valuable, although there is a difference in the value of the land situated in the territory subject to the tax, some of it, to illustrate, being now worth perhaps two hundred dollars an acre; other parts not more than fifty dollars an acre, and other parts not more than twenty-five dollars an acre. But practically all of the commercial value it now has was given to it by the erection and maintenance of the levee and the protection afforded thereby.

In 1914, or perhaps before this, the levee commissioners, and some of the persons whose lands were benefited by the levee, came to the conclusion that the 50 cent *ad valorem* tax was not sufficient to keep the levee in repair, and so they procured the enactment of the legislation of 1914 authorizing the levee commissioners to annually impose what is denominated in the act an acreage tax of not exceeding 50 cents per acre on the land situated "within the territory protected by such levee," in addition to the 50 cents *ad valorem* tax; and, as we have said, it is this acreage tax only that the plaintiffs are seeking to enjoin the collection of.

The act of 1914, following the form of the previous levee acts and being indeed in its first thirteen sections a re-enactment of the acts of 1902 and 1908, did not, as we have said, describe or lay off any levee district or territory that would be benefited or protected by the levee, and did not authorize the county court or any other tribunal to lay off or describe a levee district or other territory that would be benefited by the levee. Its promoters as well as the legislature, seemed to assume, as was apparently assumed in the legislation of 1902 and 1908, that the persons interested in or affected by the tax, knew what land was embraced in the levee district and protected by the levee, as the act authorized the imposition of this acreage tax "against the land owners embraced in said levee district and protected by such levee."

It will further be noticed that this Act of 1914 did not make any provision for giving the land owners an opportunity to be heard concerning the amount of the acreage tax within the 50-cent limit that might be levied, or a voice in saying what land should be considered as lying within the district or as being protected by the levee, or as to whether a uniform tax should be levied upon each acre of land or the tax be graduated to correspond to the value and quality of the land and the benefits conferred. It simply lodged in the levee commissioners the power to lay the levy, and pursuant to this power they laid a levy of 25 cents on each acre of land within the territory that had been laid off as a levee district.

We may also here say that there is no sustained charge of fraud or wrong-doing upon the part of the levee commissioners except in so far as their levy of this tax may be a wrongful act, and we think the evidence

shows that an annual acreage tax in some amount or an increased *ad valorem* tax was needed for the maintenance and repair of the levee in addition to the present *ad valorem* tax.

Nor is it questioned that the legislature has the power to provide for the construction and maintenance of a levee as a local, public, beneficial improvement, or the right to lay off, or to authorize the county court or some other court of general jurisdiction, or a body appointed for that purpose, to lay off a district comprising the territory that would be benefited by a levee, or the right to provide for the imposition of a tax upon the property benefited for the construction and maintenance of the improvement, because it is well settled by numerous cases decided by this court, as well as others, that the legislature has the power, subject to constitutional limitations, to provide for local, public improvements in designated districts and to impose a tax therefor. Examples of the exercise of this power are found in numerous statutes universally approved, authorizing assessments for the improvement of streets in municipalities and for the improvement of farming lands in described districts by the building of drains and ditches at the cost of the property owners benefited by the improvement. In support of this we do not think it necessary to refer to authorities other than those later to be mentioned.

The right, however, of the levee commissioners to levy and collect this acreage tax is assailed upon the ground: (1) That it lodges in the levee commissioners the arbitrary power to determine what lands will be benefited or protected by the levee, and the right to fix the amount of the acreage tax that may be annually levied, without giving to any of the citizens whose lands may be subjected to the payment of the tax, notice of their contemplated action or opportunity to be heard, in violation of section 2 of the State Constitution, providing that: "Absolute and arbitrary power over the lives, liberty and property of freemen exists nowhere in a republic, not even in the largest majority," and in violation of the provisions of section 11 of the constitution, providing that no person shall be "deprived of his life, liberty or property, unless by the judgment of his peers or the law of the land," as well as of the provision in the 5th and 14th amendments to the constitution of the United States that no person shall "be deprived of

life, liberty or property without due process of law";
(2) That the tax is not uniform and the land owners do
not pay taxes either according to the value of their property
or the benefits derived, because the same acreage
tax is levied on all the land within the levee district,
although some of it is of greater value than other of it
and some of it derives greater benefit from the levee
than other of it, all in violation of section 171 of the
State Constitution providing that taxation "shall be
uniform," and of section 174, providing that all property
shall be taxed "in proportion to its value"; (3)
That it is local and special legislation because it provides
that it shall not apply to counties having a population
of two hundred thousand or more, in violation of
section 59 of the constitution, providing, in part, that
"the General Assembly shall not pass local or special
acts . . . . to authorize or to regulate the levy, the
assessment or the collection of taxes."

In opposition to these contentions the soundness of
which is denied and in support of the legislation and the
action of the levee commissioners, the argument is made:
(1) That the plaintiff property owners are estopped to
raise the question of the invalidity of the legislation or
of the action of the levee commissioners thereunder, because
they voluntarily aided in procuring the legislation,
or at least consented to or acquiesced in its procurement,
as well as assisted in designating the territory
to be benefited by the levee, and paid all the *ad
valorem* assessments that were levied by the commissioners
and received the benefits of the expenditures of
the funds raised by these levies in the greatly increased
value of their property lying in the levee district; (2)
That they concede, or at least do not dispute, that the
construction of the levee has been of great benefit to
their land in enhancing its value by largely increasing
its productiveness; and as the evidence shows that an
acreage tax is necessary to maintain the levee, they
cannot attack the levy of the tax which it is claimed is
not excessive; (3) That these complaining property owners,
by their conduct in accepting the benefits conferred
by the building of the levee, and in voluntarily paying
the *ad valorem* tax levied by the commissioners, and in
consenting to or acquiescing in the laying off of the
territory by the commissioners, in which territory their
lands were situated, and procuring the legislation
authorizing the acreage tax, waived their right to notice

or opportunity to be heard, to which they might have been entitled except for the circumstances stated.

We think, however, that these several contentions of the respective parties may be simplified and abbreviated by resting the case for the complaining property owners upon the ground set up by them that the legislation of 1914 is violative of section 11 of the State Constitution and of the 5th and 14th amendments to the Federal Constitution before quoted, in that it conferred upon the levee commissioners the power to levy an acreage tax upon the property situated in the levee district without giving notice to the property owners affected, and without allowing them opportunity to be heard as to the amount of the acreage tax that should be levied, or opportunity to say whether it should be uniform upon all the land in the levee district or graded in proportion to the value of the land benefited, as is the *ad valorem* tax; and that the defense for the levee commissioners, which, of course, denies the correctness of this contention, may be put upon the ground that as the complaining property owners assisted in the procurement of the legislation complained of and consented to or acquiesced in the laying off of the designated boundary of land as a levee district, and approved the imposition of the *ad valorem* tax by paying the same without protest or objection for a number of years, they are now estopped to resist the payment of the acreage tax which the evidence shows is necessary to maintain the levee and protect their land, which has been largely increased in value by the construction and maintenance of the levee. Thus limiting the scope of the questions to be decided, we may well say at the outset that there is no provision of the State Constitution of as much or, at least, of greater value to the citizen than that part of the section quoted providing that no person "shall be deprived of life, liberty or property unless by . . . . the law of the land," nor is there any provision of the Federal Constitution more essential to the rights of the citizen than that providing that no person shall be "deprived of his life, liberty or property without due process of law."

The great declaration that no person "shall be deprived of life, liberty or property unless by . . . . the law of the land," was taken from Magna Charta and it is noted by Blackstone in his commentaries that this provision alone in that instrument "would have merited giving to it the title that it bears of the great charter."

In some constitutions the words "due process of law" are used and in others the words "the law of the land," but as they are well understood by frequent adjudications to mean the same thing, it is not important which phraseology is employed: Cooley's Constitutional Limitations, 6th ed., page 429; Den v. The Hoboken Land & Improvement Co., 18 Howard (U. S.) 272, 15 L. Ed. 372; Davidson v. Board of Admrs. of New Orleans, 6 Otto 97, 24 L. Ed. 616.

Sufficient is it to say that in one form or the other these phrases have been handed down from one generation to another, and put in one constitution after another, until they have come to be regarded as so fundamental a part of every enlightened system of government that no free people would dare to leave them out of their organic law and no court would now be so bold as to attempt to set them aside or deprive them of the meaning they have been universally adjudged to have since their insertion in the constitutions of the states and the nation, and, indeed, long before written constitutions were thought of.

That there need, however, be no fear that any court of last resort will treat them lightly, has been emphasized in many cases that have come before the courts, especially the Supreme Court of the United States, in which the protective features of these phrases have been relied on, and their meaning and effect sustained and defined times without number. Indeed, there is scarcely a text-book treating any subject of substantive law or a volume of legal reports in which there may not be found some reference to "due process of law" or "law of the land." It would, however, serve no useful purpose in this opinion to even attempt to collate the various definitions that have been given by the courts. We need only to say that the substance of them is that "due process of law" and "the law of the land" mean when applied to actions, proceedings or prosecutions pending in any court that no citizen shall be deprived of his life, or his liberty, or his property, without reasonable notice and reasonable opportunity to be heard according to the regular and established rules of practice and procedure before judgment is pronounced depriving him of either. Cooley's Constitutional Limitations, 6th ed., page 429; Hutrado v. People of California, 110 U. S. 516, 28 L. Ed. 232; Hagar v. Reclamation District No. 108, 111 U. S. 701, 28 L. Ed. 569; Holden v.

Hardy, 169 U. S. 366, 42 L. Ed. 780; Ely v. Thompson, 3 A. K. Mar. 70; Varden v. Mount, 78 Ky. 86; City of Paducah v. Ragsdale, 122 Ky. 425; City of Louisville v. Cochran, 82 Ky. 15; Marshall v. McDaniel, 12 Bush 378.

For example, before judgment goes in any case, whether the sum in controversy be large or small, the defendant must have been duly notified of the time and place when and where it would be sought to take judgment against him, and reasonable time to prepare and present his defense, if he has any. And so in penal or criminal prosecutions, however trifling or serious the offense, or whether the penalty attached to its commission is great or small, before he can be deprived of his liberty, or his life, or his property, the defendant must have notice of the nature of the accusation against him and reasonable time to establish his innocence. Likewise, when the person of the defendant is not put in peril and no attempt is made to deprive him of his life, or his liberty, or to take judgment against him for a sum of money, but it is only his property, personal or real, that is sought to be subjected, he must have reasonable notice of the pendency of the procedure and opportunity to resist the demand asserted against his property.

It should further be said that the protective principles that find expression in the words "due process of law" and "the law of the land," are not confined to strictly court proceedings or to cases or prosecutions pending in a court of justice, but they are broad enough to and do include efforts to take the property of the citizen when the attempt is made to do so under a power lodged by legislative authority in some *quasi* judicial tribunal such as the city council of a city or a board invested with authority to assess, levy and collect taxes or take property for public purposes.

It must, however, be kept well in mind that the courts, without exception, have made a broad distinction in the meaning and effect of the terms "due process of law" and "the law of the land" when coming to apply them to actions, proceedings or prosecutions duly and regularly pending in courts of justice and when applying them to matters affecting the assessment, levy and collection of taxes, under legislative authority by city councils or boards invested with authority to assess property and levy and collect taxes thereon in territory that has been set apart as a tax district. So marked is this well recognized difference in the application of the rule of

"due process of law" and "the law of the land," that what would be deemed to violate their meaning in a court proceeding will not be treated as violative of it in an ordinary tax proceeding. In other words, the assessment, levy and collection of taxes is in the very necessity of things summary and regulated and controlled by so many different laws intended to be adaptable to so many different conditions, all of them requiring prompt action in the assessment as well as the collection of taxes for government purposes, that great liberality has been displayed by the courts in defining and applying the safeguard contained in "due process of law" and "the law of the land."

Thus it was said in C., N. O. & T. P. Ry. Co. v. The Commonwealth of Kentucky, 81 Ky. 492: "The words, *law of the land,* are equivalent to *due process of law,* and mean the right to be heard for the preservation and protection of life, liberty, and property; but it was never supposed that this provision of the Bill of Rights applied to the exercise of sovereignty in imposing taxes for its preservation and maintenance, other than the right of the assessor to value the property upon the oath of the taxpayer and other evidence, as provided by the statute; and if dissatisfied with the valuation, the owner, in the absence of a provision giving him a further hearing, must look to the legislature for relief, and not to the judicial tribunals of the state. Such has been the uniform construction of the state courts where the term *due process of law or its equivalent* is found in state constitutions, and attempted to be applied to questions affecting state taxation for revenue purposes."

And it was said in City of Louisville v. Cochran, 82 Ky. 15: "There is, it is true, a vast difference as to controversies between citizen and citizen, relative to their private rights, and controversies between government and its citizens about their public duties. As to the former, the law of the land throws its inviolable protection around the property of the citizen through constitutional preservation of due process of law, which means that he shall be brought into court by notice or warning, and there given an opportunity to make known or assert his rights, or maintain his lawful defenses, introduce his evidence, have it heard and weighed according to its truth, unrestricted by arbitrary rules that pervert its meaning, and have judgment pronounced

upon his cause after a regular, fair, open trial, according to the principles of private right and distributive justice, as administered by the usage, course and solemnities of the common law. To the latter a different rule, based upon state necessity and immemorial usage, is applicable. The laws for the levy, assessment, and collection of taxes may be summary in their nature, and dispense with the careful and methodical steps of the common law in giving personal notice, making up issues by regular pleadings, have a trial by jury, judgment, and execution.

"The collection of taxes under such summary laws is generally and properly confided to ministerial officers. And when the power of levy and assessment is delegated, notice is usually required as to the former, and must be given, and an opportunity to be heard allowed as to the latter. And while this summary remedy for levying, assessing and collecting taxes has the plea of necessity and immemorial usage for its support, every dictate of natural justice and the letter and spirit of the constitution require that the citizen shall be warned, and have an opportunity to be heard before he is condemned, or his money or property taken, and secure to him the right to have a judicial hearing upon the existence of an alleged power and the legality of its exercise whenever his constitutional rights are imperiled thereby . . . . But in every case, and under all forms of remedy, the citizen has a right, which must be preserved, to be heard before some tribunal on all questions which are essential to the constitutional protection of his property."

Again, in Ray v. Armstrong, 140 Ky. 800, it was said: "It is next urged that the act is vicious, and violates the fourteenth amendment to the constitution of the United States in that its effect is to take the citizen's property without due process of law. It is argued that as the act does not provide for giving a hearing to the individual taxpayers by the board, they are not given 'a day in court.' Just what notice must be given the taxpayer to satisfy that provision of the Federal Constitution has never been set down. It is, though, settled that it does not mean such notice as a suitor in court is entitled to."

In Hagar v. Reclamation District No. 108, 111 U. S. 701, 28 L. Ed. 569, the court, in pointing out the distinction between the application of due process of law to proceedings in court, and to the assessment and collection

of taxes, said: "Undoubtedly, where life and liberty are involved, due process requires that there be a regular course of judicial proceedings, which imply that the party to be affected shall have notice and an opportunity to be heard; so, also, where title or possession of property is involved.. But where the taking of property is in the enforcement of a tax, the proceeding is necessarily less formal, and whether notice to him is at all necessary may depend upon the character of the tax and the manner in which its amount is determinable. The necessity of revenue for the support of the government does not admit of the delay attendant upon proceedings in a court of justice, and they are not required for the enforcement of taxes or assessments."

In C., N. O. & T. P. Ry. Co. v. Kentucky, 115 U. S. 321, 29 L. Ed. 414, the Supreme Court, in answer to the objection that the Kentucky law authorizing the assessment and collection of taxes from the railroad company was depriving it of its property without due process of law, said: "It has, however, been repeatedly decided by this court that the proceedings to raise the public revenue by levying and collecting taxes are not necessarily judicial; and that 'due process of law,' as applied to that subject, does not imply or require the right to such notice and hearing as are considered to be essential to the validity of the proceedings and judgments of judicial tribunals. Notice by statute is generally the only notice given, and that has been held sufficient."

In Fallbrook Irrigation District v. Bradley, 164 U. S. 112, 41 L. Ed. 369, the court said: "Due process of law is not violated, and the equal protection of the laws is given when the ordinary course is pursued in such proceedings for the assessment and collection of taxes that has been customarily followed in the state and where the party who may subsequently be charged in his property has had a hearing or an opportunity for one provided by the statute."

A further extended discussion of this subject may be found in French v. Barber Asphalt Paving Co., 181 U. S. 324, 45 L. Ed. 879; Page & Jones on Taxation by Assessment, vol. 1, sections 114, 145; Cooley on Taxation, vol. 1, pages 43-72.

But, although there is a distinction between the application of the rule of "due process of law" and "the law of the land" to ordinary court proceedings and its application to tax proceedings, all of the courts recog-

nize that in tax proceedings, when the power of assessment or the authority to fix the value of the property to be subjected to a tax, or the amount of the tax that may be imposed, is lodged in some board created by legislation, the property of the taxpayer cannot be taken for the tax unless at some time in the course of the proceedings, and in some form or manner, before some person or body charged with the assessment or levy of the tax, he has an opportunity to be heard. In other words, the right of the taxpayer to notice and opportunity to be heard in tax proceedings is just as indispensable before his property can be taken for taxes as it is before his property can be taken to satisfy the judgment of a court, the only difference being that notice of a suit in court and opportunity to present his defense must conform to regular and established rules of procedure, while in tax matters the notice and opportunity to be heard need not follow any established or settled practice or procedure, or be according to any uniform system of laws, but it may be varied according to the will of the legislature in such manner as to the legislature may seem best adapted to enable the taxing authorities to promptly assess, levy and collect the taxes needed for the governmental purpose in view.

This court, as well as the Supreme Court of the United States, has in many cases consistently held that before the property of the taxpayer can be taken for special purposes, such as assessments in municipalities or taxing districts under the power vested in an assessing or taxing board the taxpayer must at some time or in some manner have notice of the tax that it is proposed to levy on his property or assess against him, and opportunity to be heard in opposition to the proposed assessment or levy.

Thus it is said in Page & Jones on Taxation by Assessment, vol. 1, sec. 119: ''The constitutional provisions which forbid the taking of property without due process of law find their most prominent sphere of influence as far as the law of local assessments is concerned, in the doctrine of the necessity of notice. That under these constitutional provisions the owner of the property assessed is entitled to some form of notice of the assessment at some stage of the proceedings, is clear by the great weight of authority. At what stage of the proceedings such notice must be given and of what the property owner is entitled to notice, are questions upon

which there is not so clear a consensus of opinion. The general rule is that at some time before the assessment becomes an absolute finality there must be a notice to the property owner and an opportunity for a hearing as to those questions of fact which concern the amount of the assessment to be imposed upon such property, except such as the legislative power has authority to determine without especial inquiry, and has in fact so determined.''

And in Cooley on Taxation, 3rd ed., vol. 1, page 626, it is said: ''It is a fundamental rule that in judicial or *quasi*-judicial proceedings affecting the rights of the citizen he shall have notice and be given an opportunity to be heard before any judgment, decree, order, or demand shall be given and established against him. Tax proceedings are not in the strict sense judicial, but they are *quasi*-judicial, and as they have the effect of a judgment, the reasons which require notice of judicial proceedings are always present when the conclusive steps are to be taken. Provision for notice is therefore part of the 'due process of law' which it has been customary to provide for these summary proceedings; and it is not to be lightly assumed that constitutional provisions, carefully framed for the protection of property rights, were intended or could be construed to sanction legislation under which officers might secretly assess the citizen for any amount in their discretion, without giving him an opportunity to contest the justice of the assessment. It has often been very pointly and emphatically declared that it is contrary to the first principles of justice that one should be condemned unheard; and it has also been justly observed of taxing officers, that 'it would be a dangerous precedent to hold that any absolute power resides in them to tax as they may choose without giving any notice to the owner. It is a power liable to great abuse,' and it might safely have been added, it is a power that under such circumstances would be certain to be abused. 'The general principles of law applicable to such tribunals oppose the exercise of any such power.' .. .. . .

''It is not customary to provide that the taxpayer shall be heard before the assessment is made, except where a list is called for from him, but a hearing is given afterwards, either before the assessors themselves, or before some court or board of review. And of the meeting of that court or board the taxpayer must in some

manner. be informed, either by personal notice, or by some general notice which is reasonably certain to reach him, or—which is equivalent—by some general law which fixes the time and place of meeting and of which he must take notice. The last is a common method of bringing the assessment to the notice of the taxpayer, and it is perhaps the best of all, because it comes to be generally understood, and is remembered.''

This text is supported by numerous authorities, out of which we may select the following:  C., N. O. & T. P. Ry. Co. v. Com., 81 Ky. 492; City of Louisville v. Cochran, 82 Ky. 15; C. & O. Ry. Co. v. Mullins, 94 Ky. 355; Barfield v. Gleason, 111 Ky. 491; Eastern Kentucky Coal Lands Corporation v. Com., 127 Ky. 667; Ray v. Armstrong, 140 Ky. 800; Shaw v. Board of Drainage Commissioners Daviess County, 160 Ky. 422; Davidson v. Board of Admrs. of New Orleans, 6 Otto (U. S.) 97, 24 L. Ed. 616; Hagar v. Reclamation District No. 108, 111 U. S. 701, 28 L. Ed. 569; C., N. O. & T. P. Ry. Co. v. Com., 115 U. S. 321, 29 L. Ed. 414; Paulsen v. City of Portland, 149 U. S. 30, 37 L. Ed. 637; Fallbrook Irrigation District v. Bradley, 164 U. S. 112, 41 L. Ed. 369; Parsons v. District of Columbia, 170 U. S. 45, 42 L. Ed. 943; French v. Barber Asphalt Paving Co., 181 U. S. 324, 45 L. Ed. 879; Londoner v. Denver, 210 U. S. 373, 52 L. Ed. 1103.

Coming now to apply the principles announced in these authorities to the case we have, we find:  (1) That the legislature of the state did not lay off the levee district or provide that any court, tribunal or other body should lay it off; nor did it specify the amount of acreage tax that should be levied each year, but left this to be settled by the levee commissioners under a provision that it should not exceed 50 cents per acre annually.  (2) That no provision of any kind or character was made in the act providing for the levy of this acreage tax for notice to, or hearing, at any time or in any manner, by the persons on whose land the tax was to be levied, or for opportunity to be heard as to the amount of the tax that should be levied, or as to whether it should be uniform or graded according to the value of the land in the taxing district; the act lodging in the levee commissioners the arbitrary power to levy such taxes, within the limits of the act, as to them seemed necessary, and the power to make it uniform or graded according to the value of the land, as they pleased.

It seems clear, however, from the authorities cited that notice to the taxpayers affected and opportunity to them to be heard before the levee commissioners was necessary to the validity of this legislation and to prevent it from being violative of "due process of law" and "the law of the land." And the protective principle, that notice and opportunity to be heard must be allowed, is applicable in all cases where notice and opportunity to be heard is essential without reference to the value of the property sought to be subjected or the amount of tax sought to be levied.

But before passing this branch of the case it is well to say that the cases holding notice to the taxpayer and opportunity to be heard when a tax or special assessment is levied for a local improvement have taken such a wide range in describing the character of notice and hearing necessary, that it is not practicable to deduce from them any formula that would meet the requirements of every case in which the question of want of notice and hearing is raised. We think, however, that it may safely be said that in cases of special assessments like the one here in question where the Legislature does not describe the territory to be benefited by the assessment or fix the amount of the tax that may be levied, but leaves the laying off of the territory or the amount of the tax to a board, the legislation must provide for reasonable notice to the taxpayers that will be affected by the levy, either by publication or personal notice, or direct the administrative board to give such notice, which must fix a time and place when and where the taxpayers so affected may have opportunity, if they desire, to be heard in opposition to the amount of the tax to be levied, and also to be heard on the question as to whether at all or to what extent the property sought to be subjected to the tax is benefited by it, and as to whether the tax shall be uniform or be graded according to the value of the land burdened.

It may also be provided that when this notice and opportunity to be heard is afforded, the action of the board shall be final. But the finality of the board's action will not prevent review by the courts, when, as said in Kentucky Heating Co. v. City of Louisville, 174 Ky. 142, "it is made clearly to appear that the board acted corruptly or fraudulently, or made an assessment so excessive as that it amounted to spoliation."

We are, therefore, of the opinion that unless these complaining landowners are estopped to raise the question of the validity of the levy the judgment of the lower court, enjoining the collection of the tax levied by the commissioners, must be upheld.

But, if it should be conceded that notice to the taxpayer and opportunity to be heard are essential to the validity of legislation creating taxing districts and providing for the levy of special taxes therein by boards invested with this authority, the argument is further made in behalf of the levee commissioners that the complaining property owners are estopped to avail themselves of the invalidity of the legislation because they assisted in the procurement of this 1914 legislation, and, as said by counsel, "agreed to the formation of the levee district and agreed to the building of this levee for the pecuniary gain of the parties interested as well as the public. When each contributed in some part to the construction of this levee, or had bought land on the faith of the levee, expecting thereby personal profits, each voluntarily entered into this private corporation, or, if not a private corporation, then into this voluntary association, and thereby pledged his land for the payment of just charges for the maintenance of the levee. . . . .

"We cannot understand how any person who for a time seeks to receive the benefits of an enterprise, can afterwards, while still receiving the benefits, ask the court to relieve him from paying a reasonable part of maintaining this enterprise in proportion with all the others.

"This is not a formation of a new district, and building of a new levee, under this law, where the benefits to be gained might be uncertain. This case involves the maintenance of a levee that has been in existence with the consent of every one for several years, and by which everybody has been benefited."

That a property owner may be estopped by his acts and conduct to attack the validity of unconstitutional legislation from which he has derived benefits, is a rule announced by many courts, including our own.

The first case perhaps in which the matter was brought to the attention of this court was Neilson v. Churchill, 5 Dana 333, where it was said, in substance, that parties who have recognized the binding force of an unconstitutional act and accepted benefits under it, should not thereafter be permitted to question its validity.

In Ferguson v. Landram, 1 Bush 548, and the same case in 5 Bush 230, it was held that parties are estopped from denying the constitutionality of an illegal statute by participating in the procurement of its passage, by ratifying and acquiescing in it, or approving it after its passage, and by becoming recipients of benefits under it, although it is unconstitutional and invalid as to all other persons.

In Horetz v. Jefferson Southern Pond Draining Co., 119 Ky. 824, it was said: "That one who procures unconstitutional legislation, and receives its benefits, is estopped to deny its validity, is well settled in this state."

See also Hurley v. Motz, 151 Ky. 451, in which the doctrine of these cases was held not to apply to an attack by citizens of the municipality upon the validity of the legislation creating it.

In O'Brien v. Wheelock, 184 U. S. 450, 46 L. Ed. 636, the court, although denying that the estoppel pleaded in that case was available to defeat the contention that an act of the legislature was unconstitutional, said, in the course of the opinion: "The result is not inconsistent with the cases that hold that, although a law is found to be unconstitutional, a party who has received the full benefit under it, may be compelled to pay for that benefit according to the terms of the law. This is upon the theory of an implied contract, the terms of which may be sought in the invalid law, and which arises when the full consideration has been received by the party against whom the contract is sought to be enforced."

In Shepard v. Barron, 194 U. S. 553, 48 L. Ed, 1115, Shepard brought suit to enjoin the collection of an assessment for a public improvement on the ground that the rule of assessment prescribed by the statute under which the assessment was made operated as a denial of due process of law. But the court, in holding that the suit was properly dismissed upon the ground that the plaintiffs were estopped to question the validity of the legislation, said: "It does not in the least matter what we may call the defense, whether it be estoppel or implied contract, or one partaking of the nature of both, the result arrived at being that the plaintiffs are told that under all the facts proved in the case they cannot set up the unconstitutionality of the act, or that they are not bound by their contract to pay the assessment. Where, as in this case, the work is done and the assessment made at the instance and request of the plaintiffs

and the other owners, and pursuant to an act (in form, at least) of the legislature of the state, and in strict compliance with its provisions and with the petition of the landowners, there is an implied contract arising from such facts that the party at whose request and for whose benefit the work has been done will pay for it in the manner provided for by the act under which the work was done. . . . .

"It is, therefore, upon these facts, immaterial that the law under which the proceedings were conducted was unconstitutional, because the work was done at the special request of the owners, under the provisions of the act, and upon a contract, both implied and in substance expressed, that the bonds would be paid, and the assessment to be imposed for the raising of a fund to pay them would be legal and proper.

"Although the landowners have been greatly disappointed in the results of the improvements, and the affair has proved somewhat disastrous, yet they have obtained just such an improvement as they asked for and expected, and they are the ones to bear the disappointment and loss. . . . .

"Provisions of a constitutional nature, intended for the protection of the property owner, may be waived by him, not only by an instrument in writing, upon a good consideration, signed by him, but also by a course of conduct which shows an intention to waive such provision, and where it would be unjust to others to permit it to be set up. Certainly when action of this nature has been induced at the request, and upon the instigation, of an individual, he ought not to be thereafter permitted, upon general principles of justice and equity, to claim that the action which he has himself instigated and asked for, and which has been taken upon the faith of his request, should be held invalid, and the expense thereof which he ought to pay, transferred to a third person."

Many other authorities holding that persons who procure the enactment of unconstitutional legislation will be estopped to challenge its validity after they have received benefits under it, may be found in Page & Jones on Taxation by Assessment, vol. 2, sections 1010-1038; Bigelow on Estoppel, 6th ed., page 755; Cooley on Taxation, vol. 2, pages 1514-1517. But the evidence as to the acts and conduct of these complaining property owners does not bring them within the reach of the doctrine of estoppel sought to be invoked. It is perhaps true that

some of them took a minor part in securing the enactment of this 1914 legislation, while others had nothing whatever to do with it. The evidence, however, further shows that those who did participate to some extent in securing the legislation were induced to do so under a misapprehension as to its legality, and that all the plaintiffs brought this suit upon the first attempt of the levee commissioners to levy, in 1915, a 25 cent acreage tax, although they paid a 5 cent acreage tax in 1914, believing at the time that the legislation was valid. Under these circumstances, we feel justified in saying that their conduct was not sufficient to estop them from assailing the validity of the act.

To work an estoppel that will deny the right to assail unconstitutional legislation, there must be clear evidence showing that the party sought to be estopped aided in procuring the legislation and derived benefit therefrom, and that to set it aside would work a hardship or injustice on others who were misled to their prejudice into believing that the legislation was valid, and we do not find the existence of either of these essential things in the record before us.

Nor does the long-continued acquiescence of these property owners in the boundary of the territory and the payment of the *ad valorem* tax by them estop them from attacking the validity of the assessment of the acreage tax. This acreage tax was a new tax, in the imposition of which they have never acquiesced, and from which they could not, when this suit was instituted, have derived substantial benefit. They were willing to pay the *ad valorem* tax, which was a tax apportioned among the property owners benefited according to the value of their property benefited, but the payment of this tax does not estop the property owners from contesting the validity of the acreage tax. Park County Coal Co. v. Campbell, 140 Ind. 28; Upton v. The People, 176 Ill. 632; Wakely v. City of Omaha, 58 Neb. 245.

It may be conceded that it is now too late for them to object to the district laid off as benefited by the levee, but we are quite sure that the course of conduct on the part of these complaining property owners, in respect to what was done previous to the act of 1914, does not deny them the right to assail this act. It would be extending to unreasonable and unheard of limits the doctrine of estoppel to hold that, because a taxpayer had acquiesced in and consented for a number of years to the doing of certain things that were beneficial to his prop-

erty and that of his neighbor, he must also be deemed to have given his consent to every new scheme that some other person believed would be of additional benefit to his property, although the scheme proposed and attempted to be put in operation was unauthorized by law and did not meet with his approval.

For the reasons indicated, the judgment is affirmed.