## Elk Valley Coal Company v. Thompson.

(Decided November 19, 1912.)

### Appeal from Muhlenberg Circuit Court.

1. Corporations—General Manager—Powers of.—The powers of a general manager of a corporation, who is authorized by resolution "to transact all kinds of business" for the corporation, are confined to such business matters as relate to the affairs of the corporation in the conduct of the business it is carrying on, and

he has no authority to sell the property of the corporation or to bind the corporation by a paper agreeing to pay a stipulated sum to a third party who assisted in making the sale.

2. Corporations—Ratification of Unauthorized Act of Agent.—Although an agent of the corporation may act without authority; if his act was one that the corporation might have directed him in advance to do, it may subsequently ratify his act and thereby bind the corporation to the same extent as if it had directed it to be done.

3. Corporations—Ratification—Acquiescence.—As a general rule a corporation must act through its board of directors acting as a body, and its ratification of unauthorized acts is usually done at a regular meeting, but there may be ratification without corporate action by acquiescence or failure to disaffirm an unauthorized act, and where the unauthorized act is beneficial to the corporation, and it accepts the benefits, slight evidence will be required to establish ratification by acquiescence, but where the corporation does not derive any benefit from an unauthorized act, or when it is doubtful if it has derived any benefit, and no third party or innocent party has suffered a loss, evidence of ratification by acquiescence must be clearly shown.

4. Corporations—Knowledge Necessary to Ratification by Acquiescence.—Ratification by acquiescence can only arise when the party acquiescing has full knowledge of the facts relating to the act attempted to be ratified or holds such relation to the thing that knowledge will be presumed.

HAZELWOOD & JOHNSON, TAYLOR & EAVES, O'REAR & WILLIAMS, T. B. McGREGOR, H. C. FAULKNER and JONSON WICKLIFFE & JONSON for appellant.

WILLIS & MEREDITH and JOUETT & JOUETT for appellee.

OPINION OF THE COURT BY JUDGE CARROLL—Reversing.

In an equitable suit by the appellee, Thompson, against the appellant coal company, Thompson recovered judgment for $500, with interest from November, 1909, and $8,000, with interest from January, 1909, and the coal company recovered a judgment against Thompson for $2,430, with interest from January, 1910, on a set-off pleaded by it. From the judgment against it for $8,000.00 the coal company prosecutes this appeal, not complaining of the judgment against it for $500.

It appears from the judgment that Thompson prayed an appeal from the judgment on the set-off against him for $2,430, but as no objection is made by his counsel in this court to this judgment against him, and only an affirmance is asked, we take it for granted that the con-

test in the lower court as to whether this judgment for $2,430 should have been rendered has been abandoned, and so we will not consider so much of the record as relates to the judgment for $8,000.

The Elk Valley Coal Company is a corporation organized for the purpose of operating coal mines. It was incorporated in October, 1906, with an authorized capital stock of $50,000, divided into shares of $100 each. The records of the corporation are not made a part of this record, but it appears from the evidence that C. W. Adams, was elected president of the company, and C. W. Adams John Kittinger, H. C. Thompson, J. M. Thompson and W. R. Williams were elected directors. It is also shown by the evidence that in November, 1906, J. M. Thompson, a brother of appellee, and the largest stockholder, as well as a director in the corporation, was appointed by the directors general manager of the corporation by an order reading, "Mr. J. M. Thompson was nominated general manager of the Elk Valley Coal Company to have the control and management of the business of this company, subject to the approval and direction of the president or vice-president, with the right to employ and discharge employes, and transact all kinds of business for said company." The corporation soon after this engaged in operating a coal mine, and continued to operate it until it sold its property in January, 1909.

In the latter part of 1908 the corporation became financially embarrassed and was desirous of selling its property and early in January, 1909, J. M. Thompson opened negotiations looking to a sale of the property with one Andrew Hogg, who subsequently purchased it. As the contract of January 9, 1909, on which the claim for $8,000 asserted by H. C. Thompson is based, grows out of the sale to Hogg, and its validity as a binding obligation against the corporation must be adjudged in a large measure by the circumstances surrounding its execution, it will be necessary to state with some fullness the evidence on this point.

At the time the contract was executed J. M. Thompson was a director and lived at Drakesboro, in Muhlenberg County where the mine operated by the corporation was located, and H. C. Thompson was a director and lived in Winchester, Clark County. H. C. Thompson testifies in substance that J. M. Thompson wrote him about the first of January to come down to the mine and assist in

making some arrangements about the indebtedness of the corporation, also advising him that he thought he had an opportunity to sell the property and that on January 7, in response to a telegram from J. M. Thompson, he went at once to Drakesboro and met Andrew Hogg, who was there for the purpose of looking over the mine with a view to purchasing it. He says, in effect, that his brother turned Hogg over to him to trade with, and that after talking with Hogg during one or two days he succeeded in persuading Hogg to take an option on the property by which Hogg had the right to purchase it for $125,000, or lease it for a number of years at a stipulated price, and that he insisted in reducing this option to writing. He further testifies that soon after the sale was made J. M. Thompson asked him what would be a fair compensation for his services, when he replied that he would leave that to him, but that as the corporation was making a large profit on the trade he thought he should receive a liberal reward and thereupon J. M. Thompson drew up the following contract: "This article is to show that we agree to pay H. C. Thompson for services rendered in the event that Anderson Hogg accepts the purchase option on our property as entered into this date, the sum of $8,000, or if the said Anderson Hogg accepts the lease proposed, that we pay to him the sum of $10,000, to be paid at the rate of $2,000 per year after the indebtedness of our company is all paid. H. C. Thompson agrees to arrange finances sufficient to liquidate the indebtedness owed by our company. Witness our hands this January 9, 1909. Elk Valley Coal Company by J. M. Thompson, General Manager," and handed it to him and asked if that would be satisfactory and he replied that it would be, and took possession of the paper.

On the other hand J. M. Thompson testifies that H. C. Thompson came to Drakesboro to attend a meeting of the directors of the corporation, and for no other purpose, and that his coming had no connection with the negotiations pending with Hogg; that the terms of the contract with Hogg had been practically agreed on between himself and Hogg before H. C. Thompson arrived, and that H. C. Thompson only assisted in arranging some minor details that were really more harmful than beneficial to the corporation. In relation to what took place at the time the paper was executed he says in substance, that after the option contract with Hogg had been

executed, H. C. Thompson asked him how much they would be willing to pay him if he would finance the affairs of the corporation and furnish the money to pay its debts, and also furnished him $25,000 to buy a farm, and that, after talking the matter over, H. C. Thompson said that $8,000 would be fair compensation if Hogg accepted the option to purchase the property; that while they were talking the matter over he wrote the contract sued on, merely for the purpose of putting down, for his own convenience, the substance of the proposition submitted by H. C. Thompson, not intending it to be acceptance of his proposition or a contract between them. He further says that he left the written paper on the table and that afterwards, during his absence, H. C. Thompson obtained possession of it, without his consent.

Andrew Hogg, who elected under his option to purchase and not lease, being introduced as a witness for the corporation, testified that H. C. Thompson had nothing whatever to do with bringing about or making a sale of the property to him, that the price had been agreed on between him and J. M. Thompson before H. C. Thompson arrived on the scene, and that all that was done after he came was to reduce the contract to writing.

Leaving the contract out of view, the weight of the evidence supports J. M. Thompson's version of the matter that H. C. Thompson had little if anything to do with the sale to Hogg as the evidence of H. C. Thompson is entirely unsupported, while that of J. M. Thompson is fully corroborated by Andrew Hogg, as well as by other circumstances surrounding the transaction. We might also add that there is no claim that H. C. Thompson brought Hogg and J. M. Thompson together, it being conceded that negotiations for the sale of the property were pending between Hogg and J. M. Thompson before H. C. Thompson knew anything about it. But taking the view of the case most favorable to H. C. Thompson and treating the contract as evidence that J. M. Thompson at least believed that H. C. Thompson had a good deal to do with selling the property and was entitled to compensation for his services, we will assume that J. M. Thompson agreed that H. C. Thompson should be paid $8,000, and as evidence of this executed and delivered to him the contract. Looking at the matter from this standpoint it only becomes necessary to consider two of the grounds relied on by counsel, for appellee in support of the judg-

ment, which are, first, that J. M. Thompson had authority under the resolution appointing him general manager to bind the corporation by the paper he executed and delivered to H. C. Thompson, if it was approved by the president or vice-president; and second, if he did not have such authority, with the approval of the president or vice-president, then the subsequent ratification by the directors of the corporation imparted velidity to the contract; because if the contract cannot be sustained on either one of these grounds a reversal must follow.

In considering these propositions it is important to keep in mind that there is no claim made in behalf of H. C. Thompson that either the president, vice-president or the directors of the corporation, acting officially or individually, authorized or directed J. M. Thompson to employ H. C. Thompson to assist in selling the property, or authorized or directed him to execute the paper obligating the corporation to pay the $8,000. In fact there is no evidence that the president or any of the officers of the corporation or any of the directors, except the two Thompsons, had any knowledge that H. C. Thompson would take, or had taken, any part in selling the property, or that J. M. Thompson would engage, or that he had engaged, his services, until after the sale to Hogg had been closed and the paper obligating the corporation to pay $8,000 had been executed.

Coming now to discuss the propositions stated, the first one is: Did J. M. Thompson have authority, under the order or resolution appointing him general manager, to bind the corporation by the paper he executed to H. C. Thompson? It will be observed that in the order or resolution appointing J. M. Thompson general manager he was "to have the control and management of the business of this company, subject to the approval of the president or vice-president, with the right to employ and discharge employes and transact all kinds of business for said company," and it is argued that this resolution conferred upon J. M. Thompson ample authority to bind the corporation by the contract he made with H. C. Thompson. It is true the resolution is broadly worded and conferred upon H. C. Thompson large authority, but we think it was not intended to and did not invest him with power to bind the corporation, even with the approval and direction of the president or vice-presi-

dent, in the execution of a contract of the character made with H. C. Thompson.

This resolution was adopted about a month after the corporation was organized, and there is not the slightest showing that it was contemplated by any of the officers or directors of the corporation at that time that its property would be sold, or that it was intended by this resolution to confer upon Thompson the right to sell it or to bind the corporation in any matters not connected with the transaction of the business the corporation was organized to carry on. The corporation was organized to, and at the time this resolution was adopted was engaged in, the mining of coal, and when the directors appointed Thompson general manager and gave him authority to transact all kinds of business for the corporation, the "business" contemplated by the resolution was such business as the corporation might find it necessary to transact in carrying on the business for which it was organized and in which it was engaged. It would be giving to this resolution a meaning not intended and not fairly implied by its reading to say that it conferred upon Thompson authority to sell the property of the corporation or to bind it in any manner except in connection with the business it was engaged in. The wording of the resolution does not convey the meaning that it was intended to give Thompson greater authority than we have indicated, and shows very clearly that his power was confined to matters connected with the mining of coal.

This being our construction of the resolution, it conferred no authority whatever upon J. M. Thompson to bind the corporation by the contract he made with H. C. Thompson, and as J. M. Thompson had no authority to bind the company by the contract, neither could the president or vice-president bind the corporation by ratifying or approving the contract. The power of direction and approval vested in the president and vice-president by the resolution did not go any further than to give them the right to approve anything that J. M. Thompson was authorized by the resolution to do. In other words, the scope or intention of the resolution could not be enlarged by the direction or the approval of the president or vice-president. What J. M. Thompson had the right to do under the resolution the president and vice-president could bind the corporation, by directing to be done or by

approving after it was done, but they could not, by their direction or approval, bind the corporation concerning acts that J. M. Thompson did not have the right to do under the resolution. As the resolution did not authorize J. M. Thompson to sell the property of the corporation, it necessarily follows that it did not authorize him to agree that any person who sold it would be compensated. As the corporation would not have been bound by his act in selling the property, neither can it be made liable for his act in agreeing to compensate the party who negotiated the sale. Cook on Corporations, vol. 2, sec. 719; Thompson on Corporations, vol. 2, sec. 1576.

If, therefore, this paper is to have any validity as a corporate act it must depend solely on the fact that the act of J. M. Thompson in executing it was subsequently ratified or adopted by the corporation through its board of directors, and to the consideration of this question we will now address ourselves.

We do not doubt that the board of directors had authority to adopt or ratify by corporate action the act of J. M. Thompson. They had the right, in the first instance, to authorize J. M. Thompson to make the contract, and having this right, they also had the right to ratify and approve it after it was made. So that the fact that the directors, with the exception of the two Thompsons, did not authorize or direct the making of the contract, does not impair or destroy its validity, if after it was made, they ratified or approved it.

If, however, the contract was ratified or approved it is admitted that it was not done at or in any regular meeting of the board of directors, or by any order or resolution made or adopted by the board of directors. This being true, its ratification or approval must depend entirely on the acquiesence of the members of the board of directors individually or their failure to disaffirm the act of J. M. Thompson when it was brought to their attention. The contract by which J. M. Thompson sold the property to Hogg was ratified by the directors at a regular meeting and the deed ordered to be executed to Hogg in accordance with the contract, but of course the ratification of the contract of sale did not, in itself, include the ratification of the contract to pay the $8,000. The two propositions are entirely distinct, and counsel for H. C. Thompson do not contend that the mere order of the board of directors ratifying the sale was sufficient to

constitute a ratification of this contract. They put their case upon this point on the ground that the services rendered by H. C. Thompson were beneficial to the corporation and that when it ratified the sale it accepted the benefit of the services, and, in failing to disaffirm the contract, acquiesced in its validity, and in this way ratified the act of J. M. Thompson.

At the time the sale was made there were five directors of the corporation; namely, H. C. Thompson, J. M. Thompson, C. W. Adams, John Kittinger and McCalla Fitzgerald, all of whom, it appears, were present when the order ratifying the sale was made, except Fitzgerald, but it is admitted that at this meeting of the directors no mention was made of this contract for $8,000. It was not brought before the board in any manner or form, nor was any action whatever taken by the board in respect to it.

The evidence of H. C. Thompson in relation to the knowledge the other directors had of this contract is as follows: Speaking of a meeting of the directors at which the sale was ratified, he was asked: "Q. Did they have knowledge of the contract that had been made with you? A. Yes, sir; I had told every one of them. Q. State whether or not when they ratified that sale they had knowledge of the contract that had been made with you, and whether or not any objection was raised about that contract with you. A. Yes, sir; they had knowledge of it, and I never heard any objection raised by anyone. Q. Had that agreement been ratified by the board of directors at a meeting of the directors prior to that time or at that time? A. No; not prior to that time, or at that time, but after that time the directors had a meeting and knew all about it. Q. Where was that and when was it? A. That was in Louisville. Q. When? A. I think when we all met there to hold a meeting to ratify the sale of the property. Q. Was that agreement mentioned in that meeting? A. No, sir; I had told all the stockholders about it except Mr. Fitzgerald, and I told him about it afterwards and he thought I had made an awfully good trade, or assisted in helping to make an awfully good trade. Q. Was a vote taken by the board of directors, at the time you spoke of, on this agreement? A. No, sir. Q. Did they ever approve it by any resolution or order A. No; they all told me they were satisfied with it. Q. That was not in any

meeting? A. No, sir. Q. Was it ever mentioned when the board of directors were in session and you were present? A. No, sir; not that I know of. Q. Had any order ever been made by the board of directors granting J. M. Thompson authority to agree with you for such a sum of money as this, or for any other sum of money? A. No, sir; I did not ask that. I knew he had authority to do it. He exercised authority to manage the property, signed all the contracts, notes and checks. Q. Did you have any agreement with the president or the board of directors as to the price you were to receive for your services, claimed to have been performed by you, prior to the time you claim they were rendered? A. No, sir. Q. Did you inform any member of the board of directors or the president that you would charge for such services before they were rendered? A. No, sir; I did not know what services I would have to render and could not notify them. Q. How many of these officers of the company, who participated in the meeting ratifying the sale, knew at the time of the contract upon which you sue here? A. Three of them. Q. What three? A. Mr. Adams, Mr. Kittinger and J. M. Thompson. I had not seen Mr. Fitzgerald at that time. Q. Was there any objection made to that contract upon which you sue by any of the directors at that meeting? A. No, sir; there was not. Q. Did you, at a later date, make known the fact to Mr. Fitzgerald? A. Yes, sir; showed him the 'contract. Q. What did he say about it? A. Said he thought it was a good trade. Q. Make any objection to it? A. None at all."

C. W. Adams, who was president of the company, testified as follows: "Q. Did you see a contract that had been signed by the Elk Valley Coal Company by J. M. Thompson, general manager, wherein, among other things, they agreed to give Mr. H. C. Thompson $8,000 for his services, if Hogg exercised the option and purchased the property? A. Yes, sir; I did. Q. Did you see that the first time before or after the sale was ratified by the board of directors? A. I saw that before the sale was ratified. If you will allow me to explain I saw that at the time H. C. Thompson came to Louisville to make a settlement with me, which was a short time after the sale was made. Q. Do you mean a short time before the sale was consummated? A. I mean after the sale was made but before it was ratified by the board of

directors.   Q.   State whether or not you think $8,000 would be a reasonable or unreasonable fee for these services?   A.   Well now if Mr. Thompson really made the sale I would think that compensation would not be unreasonable; that is my opinion, if he really made the sale.   Q.   You were present and participated in the meeting when the sale was confirmed?   A.   Yes, sir.   Q.   Did you know at the time of the existence of this contract?   A.   Yes, sir.   Q.   Do you know whether or not any of the other directors knew of its existence?   A.   No, sir; I do not know that; can't answer that question.   Q.   Did you make any objection to this contract then or at any other time?   A.   No, sir.   Q.   Did any other member of the board of directors, to your knowledge, make any objection to it at that time or any other time?   A.   I never heard of it."

No one of the other directors gave any evidence on this point, so that the question is, is this evidence sufficient to show the ratification of the directors by acquiescence of the act of J. M. Thompson in executing this contract?   The general rule is that where there has been no formal ratification or approval by the board of directors at a regular meeting of an unauthorized act of any agent, the question whether individual acquiescence or failure to disaffirm will amount to ratification or approval as in many instances it depends on the facts of each case.   Where the unauthorized act is beneficial to the corporation and the directors have individual knowledge of it, slight evidence will be sufficient to establish ratification by acquiescence or failure to repudiate and this upon the theory that a party who accepts benefits will be deemed to have done so with a knowledge of the conditions and circumstances surrounding the transaction out of which the act creating the benefit arose and must take the burdens with the benefits.   But where the corporation does not derive any benefit from an unauthorized act, or when it is doubtful if it has derived benefit and no third party or innocent party has suffered a loss, evidence of ratification by mere individual acquiescence or failure to repudiate must be clearly shown, and this upon the ground that a party is not to be bound by an act that he did not authorize when he has received no benefits from it, and when the other party or an innocent party has not suffered any loss.   It is a further well settled rule that ratification by acquiescence can

only arise when the party acquiescing has full knowledge of the facts relating to the act attempted to be ratified or holds such relation to the thing that knowledge will be presumed as a party will not be held to have ratified an act that he knew nothing about.

The above general rules are abundantly established by the authorities: Morawetz on Corporations, sec. 629-37; Cook on Corporations, section 712; Thompson on Corporations, sec. 2030; 10 Cyc., 1076; Kenyon Realty Co. v. National Deposit Bank, 140 Ky., 133; Huffaker v. Kriger, 107 Ky., 200; Pittsburg, Cincinnati & St. Louis Ry. Co. v. Woolley, 12 Bush, 451; Germania Safety Vault & Trust Co. v. Hargis, 64 S. W., 516; First National Bank of Fort Scott v. Drake, 29 Kansas, 311, 44 Am. Rep., 646; Allen v. American Building & Loan Association, 49 Minn., 544, 32 Am. S. R., 574; National Home Building & Loan Association v. Home Savings Bank, 181 Ill., 35, 72 Am. S. R., 245; Horton & Co. v. Long, 2 Wash., 435, 26 Am. S. R., 867; Thompson v. Laboringman's M. & M. Co., 60 W. Va., 42, 6 L. R. A. (n. s.), 311; Hoffman Steamcoal Co. v. Cumberland Coal & Iron Co., 16 Md., 456, 77 Am. Dec., 311; Pittsburg Ry. Co. v. Keokuk & Hamilton Bridge Co., 131 U. S., 371, 33 L. Ed., 157.

Applying to the facts of this case these well established principles, the case of H. C. Thompson must fail for two reasons; (1) It is not clearly shown that the corporation derived any benefit from his services. Indeed the weight of the evidence is that it did not. Nor does it appear that he suffered any loss by the failure of the directors, when their attention was called to the fact that he had a contract, to promptly disaffirm it. (2) It is not shown that the directors, who, according to H. C. Thompson knew of the contract, were advised fully or at all of the circumstances surrounding its execution. It only appears that they knew of the existence of the contract.

Under these conditions it cannot be said that the mere failure of Adams, Kittinger and Fitzgerald to disaffirm or repudiate the contract was such acquiescence on their part as would estop the corporation to deny its validity. The directors were never called upon to either adopt or repudiate the contract. There was no occasion why they should individually or collectively take any action concerning it. It is further a significant fact,

tending strongly to discredit this contract as a corporate obligation, that Thompson did not bring it before the directors when they met to ratify the sale or ask that they take any action in relation to it, although he was a director in the corporation and from his many business transactions must have been familiar with the manner in which corporations conducted their business.

Upon the whole case we conclude that the lower court erred in giving judgment against the corporation for this $8,000. Wherefore, the judgment is reversed, with directions to modify the judgment heretofore entered to the extent of vacating and setting aside so much of it as gave H. C. Thompson a judgment for $8,000, with interest from January 9, 1909.