## City of Whitesburg v. Whitesburg Water Co.

(Decided Jan. 25, 1935.)

WILLIAM W. REEVES and J. L. HAYS for appellant.

ASTOR HOGG, STEPHENS COMBS, Jr., and HOGG & MOORE for appellee.

OPINION OF THE COURT BY MORRIS, COMMISSIONER—
Affirming in part and reversing in part.

This controversy arose out of money differences between the city and the water company on account of a misunderstanding as to the proper basis for charges by the company against the city for water furnished during certain years and as to the correct amount due the city by the company for a number of fire hydrants furnished by the city to the company.

On January 4, 1933, the company sued the city for $3,525.23, with interest from January 1, 1932, for the sale of water to the city for twenty-three fire hydrants, from 1925 to 1930, and thirty-one hydrants from 1930 to 1932, inclusive. The water rentals were at the rate of $50 per hydrant per year, and the total amount claimed was $10,400, credited by $6,874.47, representing payments on account by the city and credits for hydrants furnished by the city during the period above mentioned.

The misunderstanding was brought about by the following situation: On October 7, 1924, the city council adopted an ordinance providing for the sale of a franchise for the supplying of water and light to the city and its inhabitants. It is admitted that the ordinance authorizing the sale was duly passed and that the pro-

posed sale was properly advertised, whereupon the company came forward and bid $25 for the franchise and became the purchaser.

The records of the city failed to show any step or action subsequent to the direction to advertise the franchise; there being no record of the company's bid, of its consideration or acceptance, or of award of franchise by the city to the company. Under the franchise contract as set out in the ordinance, the city was to pay the company for water furnished for usual city purposes at the rate of $50 per year per hydrant, to be paid monthly. It was further set out that all hydrants used in supplying city water were to be furnished and paid for by the city. The city was to be reimbursed by the company allowing credit for 50 per cent. of the purchase price of the hydrants on the bills due the company by the city for water rentals.

The above facts are substantially alleged in the petition, which carries as a part of same as an exhibit a copy of the ordinance authorizing the sale of the franchise. The prayer of the petition seeks judgment for the amount first named above, which is the difference between the alleged water rentals and credits to the city for hydrants furnished and voucher payments on the total account, and which difference was demanded and payment refused.

The city by answer admitted the passage of the ordinance, the advertisement and purchase and sale of the twenty-year franchise by and to the company, but denied that the bid of the company was considered by the council; that the bid was not accepted or the franchise awarded until April 2, 1929. It was then set out that on that day the company by its president and secretary, and the city by its mayor and city clerk, in conjunction with a committee, appointed by the company, entered into, signed, and acknowledged a contract concerning the franchise which changed and modified certain provisions of the ordinance of October 7, 1924; the material modification being as follows:

"That for and in consideration of the covenants and agreements hereinafter made, and the mutual benefits inuring to the parties hereto, it is agreed that a franchise to construct, operate and maintain a waterworks plant and a system of water mains for the furnishing of water to said city and the in-

habitants thereof, that was sold by said city and purchased by said company, be amended in part as follows, * * * by striking out in line 6 of Paragraph B, the words and figures 'Fifty ($50.00) Dollars,' and substituting therefor the words and figures as follows: twenty-five ($25.00) dollars. * * *''

It was further alleged in answer that it was agreed that the amended agreement should be effective as of the 1st of January, 1928, and that the original franchise should with the amendment be construed by the parties as valid and binding as if said amendments had been included in the original franchise ordinance. The city made the contract, agreement, and the ordinance of April 2, 1929, a part of its answer, and pleads that "said contract and agreement and the provisions thereof were duly accepted by each of the parties thereto, and same have been in full force and effect since its execution." Then follows a denial as to the amount owed by the city to the company, it appearing that one difference arises from a disagreement as to the number of fire hydrants furnished the company by the city, though the main difference arises by reason of the claim of reduction in hydrant rentals from January 1, 1928, to 1932, inclusive, the city asserting that, by reason of the modification of the contract, the rental during that period was at $25 per year per hydrant. In a second paragraph the city pleads what it contends to be the true number of hydrants furnished by it to the company, and asks interest on the amounts paid by it for hydrants furnished the company, and finally prays for dismissal of the company's petition and on its counterclaim or set-off for $1,492.22, with interest, the total to be credited in the event judgment be awarded the company; in other words, the city owes the company some money for rentals of the hydrants, but bases its debt on this account on calculations for 1928 to 1932, inclusive, at the $25 per year rate, and claims the amount due from the company for hydrants purchased and furnished it.

The company filed a reply in which it denied the allegations of the answer, which set out the actions of the representatives of the company and the city in consummating the agreement of April 2, 1929, but in an affirmative plea the company says that at the time of

the making of the contract the president and secretary of the company and the mayor and clerk of the city lacked power to bind either the company or the city, because of want of properly delegated authority. It pleads also that the acts of the president and secretary of the company were not thereafter ratified or approved by the company's directors or stockholders, and pleads that the attempted formation of the new contract, as to the company, was ultra vires.

Motion was made by defendant to transfer the case to equity and refer it to the master commissioner for report. The court sustained the motion to transfer, but refused to refer the cause to the commissioner. A demurrer to the petition was overruled, and upon proof and pleadings the cause was submitted to the court, who rendered judgment for the company for an amount based on hydrant rentals to the city at $50 per hydrant per year, as fixed by the original franchise. Judgment was rendered on the city's counterclaim for the amount found by the court to be due from the company to the city, giving due credit therefor on the judgment. The city appeals from the judgment.

There appears in the record certain stipulations, six in number, agreeing that there were eighteen fire hydrants in use by the city for the years 1926 to 1929, inclusive, and twenty-six hydrants in use for the years 1930 to 1932, inclusive. There was also a stipulation as to the amount of money for rentals paid by the city to the water company from May 13, 1926, to and including April 7, 1931. It was also agreed that on January 5, 1932, voucher No. 478 of $487.50 was issued to the company by the city, but payment of same had not been met by the city, and a stipulation as to the number of hydrants bought by the city and furnished to the company in the years of operation, at the total cost of $1,720.67. Perhaps the only stipulation that may have any bearing on the question at issue is one wherein it is agreed that all copies of minutes of council meetings, ordinances, and any and all copies of records filed with the pleadings should be accepted and treated by the court as evidence on the trial of the cause.

From the pleadings and the briefs in the case, it is clear that the question to be determined is whether or not the company is entitled to collect rentals at $50 per hydrant per year, as in the original sale of franchise

ordinance, or may only collect at the rate of $25 per hydrant per year from January 1, 1928, as is provided by the amended agreement of date April 2, 1929, and the solution of the problem depends on the effect of the agreement of 1929, mainly as to whether or not it was ratified by the parties, and particularly the company now denying that it was ever effective for any purpose at all. The city takes the position that the company never had any franchise at all until April 2, 1929. The company, of course, insists that it had a franchise from November 4, 1924.

The main question, it seems, is whether or not the company ratified the contract of April 2, 1929, not necessarily of record on its books, at a meeting of the directors, but by its action or nonaction, and in order to reach a conclusion, it will be necessary to recite some of the proof, making reference also to exhibits.

R. F. McClure, manager of the company since April 1931, and in charge of the company's records, testified that upon examination of the books he found no order or resolution authorizing the agreement of April 2, 1929, between the president and secretary of the company and the city's representatives.

Dr. B. F. Wright, who had twice been president of the company, once in 1928 and again in 1931, testified that in April, 1929, he was a director, and that at no time while he was a director was the April, 1929, agreement discussed or authorized by the board of directors. Dr. Wright goes somewhat into the details of the council meeting, at which the matter of ratifying the franchise and the amendment of the original clause changing the hydrant rentals from $50 to $25 per year were discussed. He says that some time in 1928 or 1929 the city council had refused to pay its water rentals at the $50 rate; the refusal being on the ground that the company had no franchise. As he recalls what happened at the meeting at which he says all the directors of the company were present, including M. K. Marlow and J. M. Day, respectively president and secretary, and some stockholders, as well as the mayor and five councilmen, they undertook in open meeting to iron out the existing difference, and, upon failure to do so, the directors agreed to, and did select Marlow and Day as agents to negotiate with representatives of the city to formulate an agreement. That was the last Dr. Wright

heard of the matter, but he says that "later I heard the matter had been adjusted."

F. F. Pendleton testifies that he was the city clerk from January, 1929, to February, 1930. He details the making of the agreement between the representatives of the city and of the company concerning the prices to be charged the city for use of hydrants, and curing the claimed defect in the company's franchise. Pendleton describes the council meeting at which the disagreement was discussed, and says that immediately after the discussion representatives of the company and of the city repaired to the mayor's office, where the discussion was continued, the contract drawn and afterwards spread upon the record book, and a duly authenticated copy delivered to the company. Part of Pendleton's testimony which seems rather important is wherein he says the city's records show that there was an allowance for eighteen fire plugs at $25 per year, which order he explains was made at the same meeting at which the amended contract and ratification of the franchise was discussed, and further, as auditor of the books of the city up to January 1, 1931, he found no item of indebtedness from the city to the company on account of hydrant rentals. These statements were not challenged.

As shown by the records of the city (exhibit filed with answer), the agreement is to all intents and purposes nothing more nor less than an ordinance of the city. It is dated April 2, 1929, and was, as far as the record shows, placed upon its passage. Five councilmen voted favorably, and the mayor declared it duly passed, and directed the clerk to publish it and certify a copy to the company.

The portion of the ordinance material here is set out above, and it shows in minute detail everything agreed upon by the representatives of the two parties. It was recited that by mistake or oversight the consideration and acceptance of the company's bid for the franchise and its award had been omitted of record. It directed that an order be entered nunc pro tunc, curing the omissions as of the date of the original ordinance, in this wise:

"That the proceedings of said council incident to the introduction, enactment and advertisement of the ordinance authorizing the sale thereof; the acceptance of the bid therefor, and the awarding

and confirmation of said sale * * * be and in all things is hereby confirmed and ratified. * * *''

It was agreed in the ordinance itself that the contract should be considered as an ordinance of the city to all intents and purposes, and it may be noted that the ordinance is not challenged in any manner; the only objection presented being that the representatives of the parties did not have the power to bind the two parties. At this point it may be sufficient to say that, since the city's records show its enactment, the ordinance would in all respects bind the city, since there is no charge of fraud or mistake attending its passage. The question remains whether or not the company is bound to the contract.

Much is said as to the contract being ultra vires as to both the city and the company. It seems to the court there is little question presented involving the principle of ultra vires, because it can not be seriously doubted that both parties had full power to enter into a contract similar to the one here presented. The matter of terms and conditions upon which the city permitted the use of its streets for utility purposes was incident to the granting of that use. The parties had the right at any time, by mutual understanding, to alter any and all conditions incident to the granting of the franchise, preserving, of course, the rights of third parties. Lutes v. Home Tel. Co., 155 Ky. 555, 160 S. W. 179. The question now is whether or not there has been any subsequent ratification of the agreement, not necessarily ratification evidenced by record showing.

It may be said that, even though the question was one of power, the court would survey the question closely in order to ascertain if any benefits flowed to the one complaining, even though lack of power be demonstrated. It is the established and general policy of the law and the effort of courts to hold corporations, no less than natural persons, to contracts which are free from charges of fraud, collusion, or evident error.

''The rule is based upon the strongest principles of justice and public policy that a contract should be enforced against a corporation when it has received the consideration or the benefits of the contract. As to contracts of corporations that are malum in se or malum prohibitum, they will not be enforced; but as

to contracts not thus objectionable justice and public policy * * * require that the doctrine of ultra vires should be limited in its scope and application.'' McQuaide v. Enterprise Brewing Co., 14 Cal. App. 315, 111 P. 927, 928; Davis v. Pacific Studios Corp., 84 Cal. App. 611, 258 P. 440; Rabbitt v. Union Indemnity Co. (Cal. App.) 35 P. (2d) 1066.

The contract recited covenants and agreements, mutual benefits and consideration, and it must be assumed by the court that such were sufficiently valuable. The condition on April 2, 1929, the date of the agreement, is evidenced by what is clearly set out in proof, pleadings, and exhibits. The city was objecting to the payment of water bills at the former agreed rate, because it claimed that the company held no franchise; the company, of course, wanting its past-due water bills paid. The city desired to collect from the company such sums as were due it for hydrants furnished to the company. In this state of case, and after reciting that ''mutual benefits'' would flow from such an agreement as would settle their disputes and allow both parties to collect and the one to continue the operation under a cured franchise, the agreement was made and ratified by the city as shown by its records.

However, now the company says that the contract was void because of a lack of authority on the part of its officers to enter into it, and because, even though after operating under it for several years, it was never ratified of record. There is a well-defined principle of law which, if applicable here, should bind the company, even though there was no delegation of authority, no record ratification, and, going one step further and conceding the whole transaction was beyond its powers, that acts, though unauthorized, if free from fraud, collusion, or error, may be ratified by overt acts; sometimes by acquiescence; sometimes by a failure to repudiate after knowledge of the change of terms or conditions, always circumscribed by the safety bulwark that such ratification by acquiescence works no hardship on innocent parties, or to parties strangers to the contract.

As to the extent of knowledge that must exist to hold ratification by acquiescence sufficient, we find the court saying in Elk Valley Coal Co. v. Thompson, 150 Ky. 624, 150 S. W. 817, 822:

''Where the unauthorized act is beneficial to the

corporation, and the directors have individual knowledge of it, slight evidence will be sufficient to establish ratification by acquiescence or failure to repudiate, and this upon the theory that a party who accepts benefits will be deemed to have done so with a knowledge of the conditions and circumstances surrounding the transaction out of which the act creating the benefit arose, and must take the burdens with the benefits. But where the corporation does not derive any benefit from an unauthorized act, or when it is doubtful if it has derived benefit, and no third party or innocent party has suffered a loss, evidence of ratification by mere individual acquiescence or failure to repudiate must be clearly shown. * * *''

Measured by the rule above announced, it seems there was here ample evidence to show ratification by acquiescence. It seems well established that the directors and some of the stockholders knew everything there was to be known concerning the April 2, 1929, amended ordinance. As to the benefits, the court has no logical way of applying measurement. The contract recited consideration and mutual benefits. It may be readily gathered from the record that at the time of the agreement the company was strongly of the impression that it had a defective franchise; a clouded title. It may have considered that it was worth a concession on its part to have the cloud removed. It may be that the city drove a sharp bargain, but there is no claim or hint that there was undue coercion or duress employed. As to evidence of the company's knowledge of the contract, enough has been said with regard to its formulation and signing to bring full notice to the directors. It may be assumed, in the absence of a showing to the contrary, that the ordinance was published as directed; the former clerk said he delivered a certified copy of it to the company, and it is in evidence that the company rendered bills after the making of the contract at the rate of $25 per hydrant per year, and this evidence is not contradicted; indeed, looking to the account which is set up in plaintiff's petition, it may readily be discerned that after 1928 the bills were rendered to and rental payments made by the city and accepted by the company at a lesser yearly rate.

The evidence is clear enough to convince the court

that the company by its acquiescence, by its failure to repudiate its now challenged act of its officers for a considerable length of time, is estopped from now claiming that the things done were unauthorized or beyond its power. McGuire v. Carroll Const. Co., 177 Ky. 675, 195 S. W. 6; Board of Commissioners v. Johnson, 178 Ky. 287, 199 S. W. 8, L. R. A. 1918E, 202; Floyd County v. Allen, 190 Ky. 532, 277 S. W. 994. The principles discussed here were fully elaborated in Elk Valley Coal Co. v. Thompson, supra, and in Caddy Oil Co. v. Sommer, 186 Ky. 843, 218 S. W. 288, though in each case the court held that there was lack of sufficient evidence to warrant a holding there was ratification by acquiescence, and on that point alone they may be distinguished from the case before us. The principle is laid down in J. I. Case Threshing Machine Co. v. Com., 177 Ky. 454, 197 S. W. 940, in which there was undoubted and sufficient evidence to uphold ratification; the case, however, turning on the fact that the statutes very forcefully prohibited the officers from doing what they had undertaken.

That the city had the power to enter into the new contract, and further to make a new contract which was curative, see Lutes v. Home Tel. Co., supra; Cohen v. City of Henderson, 182 Ky. 658, 207 S. W. 4; Blanton v. Town of Wallins, 218 Ky. 295, 291 S. W. 372, and it is equally as well settled that the unauthorized acts of agents or officers of a corporation may be ratified by the corporation, by acquiescence, or by accepting and retaining benefits, as evidenced in many cases in this and other jurisdictions, among which may be noted Commonwealth v. Mehler & Eckstenkemper L. Co., 183 Ky. 11, 208 S. W. 13; Hall-Watson Furniture Co. v. Cumberland T. & T. Co., 203 Ky. 90, 261 S. W. 883; Ford Lumber & Mfg. Co. v. Cobb, 138 Ky. 174, 127 S. W. 763; Star Mills v. Bailey, 140 Ky. 194, 130 S. W. 1077, 140 Am. St. Rep. 370; Southeastern Land Co. v. Jonnard, 198 Ky. 504, 249 S. W. 789; Seaboard Oil Co. v. Huntsman, 196 Ky. 758, 245 S. W. 860; Harlan Public Service Co. v. Eastern Construction Co., 254 Ky. 137, 71 S. W. (2d) 24; Braxmar v. Stanton, 110 App. Div. 167, 96 N. Y. S. 1096; Langsdale v. Bonton, 12 Ind. 467; McElroy v. Minn. Percheron Horse Co., 96 Wis. 317, 71 N. W. 652. Many of the cases cited base the ratification on the acceptance and retention of benefits; others on

actions indicating ratification. However, both the pre-requisites seem to exist here.

Taking up the matter of the city's counterclaim, there seems to be some confusion as to the number of hydrants furnished the company by the city. In the petition credit is given for $1,284.67, for twenty-three hydrants bought in December, 1924, with an allowance of interest, and for eight hydrants bought in 1929, at a cost of $472, also with interest. The city seems to claim for eighteen hydrants bought January 1, 1925, at a cost of $972.22, and eight hydrants bought in January, 1930, at a cost of $472. In the stipulation, the total number is fixed at thirty-one, purchased about the dates above mentioned. In the judgment the court fixes the entire number at twenty-six hydrants bought and furnished as of the dates mentioned. We shall not attempt to reconcile the inconsistency, and therefore will not disturb the court's conclusion on the ruling on the counterclaim.

On consideration of the entire record, in so far as the main point is concerned, the court takes the view that there was a ratification of the contract and ordinance of April, 1929, and therefore the parties should abide by its terms and conditions.

Holding this view, the court affirms so much of the judgment of the lower court as holds "that by the order of the city council of the City of Whitesburg, entered April 2, 1929, and termed a nunc pro tunc order, the said defendant City of Whitesburg ratified and confirmed the sale of the franchise to plaintiff as of November 4, 1924, and that plaintiff has a valid and existing franchise for the operation and maintenance of a water system in the City of Whitesburg," and so much of the judgment allowing the city a credit against the company for fire hydrants furnished the company, in addition to such credits as are in the judgment allowed the city by its rental payments. However, so much of the judgment as holds that part of the "contract dated April 2, 1929, between plaintiff and defendant, void because it was never authorized, approved or ratified by the board of directors of the plaintiff, or by the city council of the defendant, and ultra vires, and void of authority, and the contract is not binding," is reversed for reasons herein before set out, and on

return of the case the circuit court will enter a judgment consistent with this opinion.

Judgment affirmed in part and reversed in part.