**CONTINENTAL CASUALTY COMPANY, Appellant,**

v.

**L. G. WASSON COAL MINING CORPORATION, Appellee.**

Court of Appeals of Kentucky.

Oct. 21, 1966.

John A. Fulton, Woodward, Hobson & Fulton, Louisville, for appellant.

Marion Rider, Joseph J. Leary, Thomas F. Marshall, Frankfort, for appellee.

DAVIS, Commissioner.

The appellant, Continental Casualty Company (hereinafter Continental) sued appellee, L. G. Wasson Coal Mining Corporation (hereinafter Wasson) seeking recovery of more than $500,000 alleged to be due to Continental from Wasson by reason of outlays made by Continental in behalf of Wasson incident to completion of a contract Wasson had with the Department of Highways. The trial court dismissed Continental's complaint as once amended, as failing to state a claim upon which relief could be granted. CR 12.02(6). The trial court denied Continental's motion for permission to file a second amended complaint. This appeal tests the correctness of the orders of the trial court in these respects.

Wasson, as a road contractor, entered into a contract with the Department of Highways of Kentucky on January 23, 1962, whereby it undertook to construct a portion of the West Kentucky Turnpike. Continental subscribed Wasson's performance bond incident to the contract, in the penal sum of $1,977,328.83. The terms of the construction contract prescribed that work should begin on March 2, 1962, and be completed not later than May 26, 1963.

On April 26, 1963, the Department of Highways notified Wasson and Continental that it regarded Wasson as being in default in the matter of completing the contract on time. A meeting of representatives of Wasson, Continental and the Department was had on April 30, 1963, at which time the Department was assured that the work would be completed on schedule. But on May 24, 1963, the Department felt impelled

to and did notify Wasson and Continental that the work was not proceeding with sufficient dispatch; incident to that notification, the completion date was extended from May 26 to June 30, 1963.

Despite these promptings by the Department the work lagged. On July 12, 1963, the Department notified Wasson and Continental of its demand for a meeting to be held July 15, 1963, at which time Continental would be called upon to demonstrate to the Department its willingness and ability to promptly complete the project. On July 15, 1963, immediately following the meeting of the parties litigant with representatives of the Department, an order of the Department was entered by the terms of which the contract was " * * * taken out of the hands of the contractor and held in default so far as the contractor is concerned * * *." The same order provided in further part: " * * * and that Continental be hereby directed to comply with the terms of the above contract and the bond to the satisfaction of the Department within eight days hereafter."

Two days later (well within the eight days mentioned in the Department's order) Continental and Wasson entered into a written agreement respecting the completion of the work which Wasson had contracted to complete. This writing, dated July 17, 1963, recognized that the Department had "declared a default" as to Wasson, and further noted that the Department had called upon Continental "to comply with the terms of the contract and bond to the satisfaction of the Department." The following pertinent language of the July 17th contract sheds light upon the posture and intentions of Wasson and Continental respecting their respective interests:

"Whereas, the parties, after independent consideration, believe that it would be to the best interests of each if an arrangement could be made for the contract to be completed by [Continental], with the continued use of the equipment on the job or in the possession of [Wasson] necessary to a proper completion of the project, without the payment of rental for the use of said equipment and with the continued employment of such workmen and personnel as is satisfactory to the Department of Highways and to [Continental] * * *."

Based upon the recitation just quoted, the parties agreed that Continental would undertake to secure a satisfactory agreement with the Department looking toward the "completion of said contract." Wasson agreed to make available to Continental all of its equipment on the job, as well as any other equipment it had, without rental charge. Among other things, this agreement provided that Continental would obtain a superintendent for the work, satisfactory to the Department, and that Continental should have full control over the employees upon the project.

Pursuant to the July 17th agreement, Continental was able to satisfy the Department and did proceed to complete the project, using Wasson's equipment and personnel. The present litigation, so far as is pertinent to this appeal, undertakes to recover from Wasson for Continental the sum of $536,090.57, subject to credits not required to be detailed here. It is alleged that the sum sought represents the aggregate sum which Continental has been required to expend "in the performance of said contract."

Wasson filed its motion to dismiss Continental's original (and first amended) complaints, asserting that no claim was stated upon which relief could be granted. As bases for its contention, Wasson averred that (1) the procedure prescribed in the contract and in KRS 176.110(1) was not followed incident to the cancellation of the contract; (2) Continental was not a "qualified contractor" within the purview of the procedure to be followed upon cancellation; (3) for Continental to undertake the performance of a road construction contract was ultra vires.

The trial court delivered a memorandum opinion on June 22, 1965, reciting the court's views that the complaint of Continental should be dismissed. In the memorandum opinion the trial court pointed out that the terms of Wasson's contract as well as KRS 176.110 provide that upon a failure of Wasson to complete the work undertaken by the Department, the Department may cancel the contract and relet it to a qualified contractor at the original contract price, or the work shall be readvertised. It was the trial court's view that Continental had made a "clandestine" arrangement with the Department "outside and beyond its corporate authorization, in derogation of the contractual and statutory rights of its principal, and in contravention of Section 192 of the Kentucky Constitution, the language of which is clear and unmistakable."

Before entry of an order implementing the court's memorandum opinion, Continental tendered a second amended complaint, and moved for leave to file it. By judgment entered ten days later, the trial court denied the motion to file the tendered second amendment and dismissed the complaint of Continental as once amended.

Continental contends (1) that the July 17th contract between Wasson and Continental, later approved by the Department, was entirely legal, and (2) that the trial court erred in denying its motion to file a second amended complaint.

The thrust of Wasson's argument as it relates to the provisions of KRS 176.110(1) is that the construction contract was cancelled as to Wasson, hence the procedures prescribed in the statute (and substantially incorporated in the contract itself) should have been followed. For convenient reference we quote KRS 176.110(1):

"If any person having a contract with the department fails to carry out the contract, the department may cancel the contract and reward it without advertise-

ment if it can obtain a qualified contractor to perform the work at the original contract price or for less. Otherwise the work shall be advertised as required by law."

■ It is our view that the contract was not cancelled within the meaning of the statute. It will be observed that the statute reposes a discretion in the Department as to whether it cancels the contract. Wasson concedes that the word "cancel" was never used by the Department with reference to the contract, but correctly contends that the use of the specific word is not a condition precedent to cancellation. We find nothing in the steps taken by the Department which could justify a conclusion that the Department cancelled the contract within the meaning of KRS 176.110 (1). It is true that the Department took the contract "out of the hands" of Wasson —and it would seem to follow that had Continental not "satisfied" the Department that it would complete the contract, the Department would have proceeded as prescribed by the statute.[1]

It is plain, we think, that Wasson recognized the continued existence of the construction contract when it entered into the July 17th agreement with Continental. The Department also recognized the viability of the contract when it acquiesced in the arrangement for its completion as envisioned in that July 17th pact between Wasson and Continental. We are at a loss to understand why the trial court characterized as "clandestine" the arrangement which Continental obtained from the Department which was in direct compliance with Wasson's July 17th agreement with Continental. Having this view of the situation (to the extent of facts as pleaded), there is no necessity for resolution of whether Continental was a "qualified contractor" within the meaning of KRS 176.110(1). We hold that the statute simply is not applicable.

1. In our view the Department had its option to cancel or proceed as it did. It would be anomalous if Wasson, as de-

faulter, could demand the Department to exercise the option.

Wasson contends that Continental's activities in causing the completion of the construction contract were *ultra vires*, since the corporate charter of Continental does not include such functions among its corporate powers. Thus, it is reasoned, Kentucky Constitution Section 192, as well as KRS 271.145, taint the claim of Continental with such illegality as to make it unenforcible in a court. Wasson recognizes in its brief that an act of a corporation which is " * * * merely ultra vires will not, under all circumstances, render such action void." But it insists that when a corporate act is an *illegal* act, expressly prohibited by the corporate charter or by statute, then such an act is void. Cited in support of that proposition is Fletcher, Cyclopedia of Corporations, Volume 7, Section 3400, pp. 566–567, wherein it is said, in part:

"In other words, an illegal act or contract, defined as one expressly prohibited by the charter or a general statute, or which is immoral or against public policy, is ultra vires and something more. It is illegal, not merely because it is ultra vires, or beyond the powers conferred upon the corporation, but, as in the case of an act of a natural person, because of its immorality, or of its being contrary to public policy, or its being in violation of an express legislative prohibition."

We may agree, without specifically so holding, that the principle enunciated by the learned author is sound. But we find nothing in the situation at bar to bring this case within that principle. Indeed, the same authority points out that it is the policy of the law to look with disfavor upon the defense of ultra vires, where private rights only are involved. Fletcher, Cyclopedia of Corporations, Volume 7, Section 3407, p. 573. Cited in support of that statement is City of Whitesburg v. Whitesburg Water Co., 257 Ky. 444, 78 S.W.2d 330. We are unable to perceive any respect in which the July 17th contract between Wasson and Continental may be deemed to be immoral or against public policy; neither was the contract one prohibited by statute or by the corporate charter.

Kentucky Constitution Section 192 and KRS 271.145 provide in general terms that no corporation shall engage in business other than that expressly authorized by its articles of incorporation. This court has aligned itself with the majority view, however, that corporate powers include those which are expressed or implied by the corporate charter. Wilson v. Louisville Trust Co., 242 Ky. 432, 46 S.W.2d 767; Kentucky Joint Stock Land Bank of Lexington v. Farmers Exchange Bank, 274 Ky. 525, 119 S.W.2d 873, 878. We have no difficulty in holding that Continental as surety on the construction contract, had the clearly implied power to see to it that the construction contract was carried out. Cf. Standard Accident Insurance Co. of Detroit v. Rose, 314 Ky. 233, 234 S.W.2d 728; 17 Am.Jur.2d, Contractor's Bonds, Section 1, p. 192. It is patent that the interests of the public have not been adversely affected, because the Department paid only the original bid price.

In its present posture, Wasson seeks to retain the benefits of the July 17th agreement, but would disclaim any responsibilities flowing from the contract. The benefits to Wasson include its being relieved of further liability for breach of contract to the Department (including the attendant penalty of $1,000 per day for late performance). Wasson had clear responsibility to save harmless Continental from loss by reason of Continental's suretyship. This was made subject of more than one express agreement between the two companies—yet Wasson would seek absolution from that responsibility too. That this position is untenable is made clear by Marshall's Adm'r v. Webster, 287 Ky. 692, 155 S.W.2d 13, 18. See also Fletcher, Cyclopedia of Corporations, Section 3473, pp. 631–633.

Upon remand of this case, Wasson will be afforded opportunity to question the reasonableness of Continental's expendi-

tures in seeing the construction contract completed, but that matter is not before us at this time, hence it lends no support to Wasson's argument in brief in that vein.

The trial court denied the motion to file the second amended complaint primarily because it was deemed to have been tendered untimely. Since it was tendered before any pleading to the merits, and without any showing of prejudice to Wasson's position, it is our view that the tendered pleading should have been received. CR 15.01. Upon remand, the second amended complaint as tendered will be filed.

The judgment is reversed for further proceedings consistent with this opinion.